UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| [UNDER SEAL],<br><br>              Plaintiffs,<br><br>v.<br><br>[UNDER SEAL],<br><br>              Defendant. | Civil Action No.:_____<br><br><br><br>**FILED UNDER<br>SEAL** |

## MOTION FOR LEAVE TO FILE COMPLAINT *IN CAMERA* AND TO PLACE COMPLAINT UNDER SEAL

Dated: March __, 2014

              PARKER ROSEN, LLC
              STONE & MAGNANINI LLP
              *Counsel for Plaintiff/Relator*

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| United States of America, State of California, State of Colorado, State of Delaware, State of Florida, State of Georgia, State of Hawaii, State of Iowa, State of Maryland, State of Michigan, State of Nevada, State of New Jersey, State of North Carolina, State of Oklahoma, State of Tennessee, State of Texas, State of Wisconsin, District of Columbia, *ex. rel.* John Mamalakis, M.D., <br><br> Plaintiffs, <br><br> v. <br><br> Anesthestix Management, LLC d/b/a Anesthetix of Teamhealth, Teamhealth Holdings, Inc., Sonya Pease, M.D., John Ippolito, M.D., Edward J. Lee, M.D., Howard Stroupe, M.D., Sammy Dean, M.D., Jaqueline Petters, M.D., and Other Unknown Defendant Does 1-100, <br><br> Defendants. | Civil Action No.:_____ <br><br><br> **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** <br><br><br><br><br><br> **COMPLAINT** |

On behalf of the United States of America, the State of California, the State of Colorado, the State of Delaware, the State of Florida, the State of Georgia, the State of Hawaii, the State of Iowa, the State of Maryland, the State of Michigan, the State of Nevada, the State of New Jersey, the State of North Carolina, the State of Oklahoma, the State of Tennessee, the State of Texas, the State of Wisconsin, and the District of Columbia (collectively, the "States"), Plaintiffs and Relator John Mamalakis M.D. file this *qui tam* Complaint against Defendants Anesthetix Management, LLC, D/B/A Anesthetix of TeamHealth ("Anesthetix"), TeamHealth Holdings, Inc., Sonya Pease, M.D.,

1

John Ippolito, M.D., Edward J. Lee, M.D., Howard Stroupe, M.D., Sammy Dean, M.D., and Jacqueline Peters, M.D., (individually, or collectively "TeamHealth"), and allege as follows:

## SUMMARY OF THE ALLEGATIONS

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America and the States in connection with a scheme perpetrated by TeamHealth to maximize income from its anesthesia practices by knowingly and recklessly submitting false claims to federal and state health insurance programs for physician services that TeamHealth knows do not meet Medicare's billing conditions for such services, in violation of the False Claims Act ("FCA") and the false claims acts of the States.

2.      TeamHealth is one "of the nation's largest providers of hospital-based clinical outsourcing" with an operating philosophy that is "essentially the same as when [it] started," remaining "committed to a patient-centric model of healthcare delivery with hospitals, physician groups and TeamHealth working collaboratively to deliver compassionate, effective, efficient and safe patient care."  TeamHealth has over 6,200 affiliated healthcare professionals  nationwide, performing services in multiple disciplines including Anesthesia, Hospital Medicine, and Emergency Medicine.

3.      TeamHealth anesthesia services, in particular, are a major driver of revenue for the company nationwide.  In 2013, anesthesia services made up 10% of the entire company's consolidated net revenues, or approximately $240 million.

4.      Approximately 50% of TeamHealth's patient base is made up of Medicare and Medicaid program participants, and the company derives approximately 40% of its net revenues from these sources.

5.      From at least 2010 through the present, TeamHealth, both as its predecessor

2

Anesthetix and, following a 2010 merger, as TeamHealth, routinely submitted false claims to Medicare, Medicaid, and TriCare for reimbursement of non-existent or non-reimbursable services purportedly performed at Wheaton Franciscan Healthcare- All Saints Hospital ("All Saints") in Racine, Wisconsin as well as other TeamHealth affiliated hospitals and clinics in California, Colorado, Delaware, Florida, Georgia, Hawaii, Iowa, Kansas, Maryland, Michigan, Nevada, Nebraska, New Jersey, North Carolina, Oklahoma, Oregon, Tennessee, Texas, Wisconsin, and the District of Columbia, among other states.

6.     TeamHealth typically bills Medicare for the services of its anesthesiologists under "medical direction," rather than "medical supervision." Medical direction provides that the anesthesiologist may bill for services concurrently with the Certified Registered Nurse Anesthetists ("CRNA") at a higher rate if seven specific services are performed throughout the procedure, for a maximum of four concurrent anesthesia procedures; whereas, if any of the seven services have not been performed, or the anesthesiologist performs more than four concurrent procedures, Medicare must be billed at the lower rate for medical supervision, not the higher rate for medical direction.

7.     Relator has personal knowledge that, as part of the scheme, TeamHealth anesthesiologists, including Defendants Dr. Ippolito, Dr. Lee, Dr. Stroupe, Dr. Dean, and Dr. Peters, are or were typically not available and knowingly did not perform many of the steps required to medically direct such services, and nearly 100% of the time do or did not perform at least one of the following steps, all of which are required for services to be considered "medically directed" by Medicare: (a) perform a pre-anesthetic examination and evaluation, (b) personally participate in the most demanding aspects of the anesthesia plan, (c) monitor the anesthesia at frequent intervals, (d) remain physically present and available for immediate diagnosis and treatment of emergencies, and (e) provide indicated post-anesthesia care.

8.     The conduct of TeamHealth and the negligence of many of its anesthesiologists reflects a complete institutional abandonment of their patients and nurses. In some instances, the absence of the TeamHealth anesthesiologists at All Saints' operating rooms and ICUs has placed the patients' lives at unnecessary risk. Further, when an unsupervised CRNA performs care independently of the anesthesiologist, TeamHealth is not permitted to submit claims to the Government for the higher physician fee schedule rate because such claims do not meet the billing conditions of Medicare Part B.

9.     However, Relator has personal knowledge that TeamHealth routinely submitted and continues to submit false claims to federal and state health insurance programs that do not reflect its actual physician services, but rather falsely represent to the Government that TeamHealth anesthesiologists are present for, perform, or direct procedures when they have had minimal, if any, involvement in those procedures. In this way, TeamHealth is cutting its costs to provide medical services while illegally maintaining or increasing revenue by falsifying its billing.

10.     Specifically, Relator has personally observed TeamHealth conduct the following routine and systematic false claims practices:

11.     **Pre-anesthetic examination and evaluation:** Since at least 2010, TeamHealth has routinely submitted and continues to routinely submit false claims for the anesthesiology services at All Saints, and several other TeamHealth facilities, when it knew that the anesthesiologist failed to properly perform an examination and evaluation prior to delivering the anesthetic to the patient. Indeed, the physician defendants never auscultated, examined the heart or lungs, or examined the airway, all required examinations prior to delivering an anesthetic to the patient, and in order to properly prescribe an anesthesia plan for major surgery as discussed below. Relator has personal knowledge that the failure to conduct such a routine examination resulted in the submission of false

4

claims to the government health insurance programs, including Medicare, Medicaid, and TriCare, and, in some cases, direct patient harm.

12.     **Prescribes the anesthesia plan:** Since at least 2010, TeamHealth has routinely submitted and continues to routinely submit false claims for the anesthesiology services at All Saints, and several other TeamHealth facilities, when it knew that the anesthesiologist failed to prescribe a proper anesthesia plan. Relator has personal knowledge that the failure to properly prescribe an anesthesia plan resulted in the submission of false claims to the government health insurance programs, including Medicare, Medicaid, and TriCare, and, in some cases, direct patient harm.

13.     **Personally Participation in Demanding Procedures:** Since at least 2010, TeamHealth has routinely submitted and continues to routinely submit false claims for the anesthesiology services at All Saints, and several other TeamHealth facilities, when it knew that the anesthesiologist failed to participate, or even be present for emergence or anytime during the emergence period, as well as other critical events during the anesthesia procedure. Relator has personal knowledge that the failure to personally participate in the most demanding anesthesia procedures by anesthesiologists resulted in the submission of false claims to the government health insurance programs, including Medicare, Medicaid, and TriCare, and, in some cases, direct patient harm.

14.     **Monitors the anesthesia administration at frequent intervals:** Since at least 2010, TeamHealth has routinely submitted and continues to routinely submit false claims for the anesthesiology services at All Saints, and several other TeamHealth facilities, when it knew that the anesthesiologist regularly failed to monitor the continued administration of anesthesia at frequent intervals. Indeed, Relator is personally aware that anesthesiologists were encouraged to, and did, falsify the anesthesia record to indicate that they regularly monitored the administration of anesthesia

5

when they in fact did not conduct any such monitoring. Relator has personal knowledge that the failure to monitor the administration of anesthesia at frequent intervals resulted in the submission of false claims to the government health insurance programs, including Medicare, Medicaid, and TriCare, and, in some cases, direct patient harm.

15.    Relator has personal knowledge that TeamHealth perpetrated this fraud at All Saints, as well as other TeamHealth affiliated hospitals and clinics across the country, and has personal knowledge that TeamHealth officials were fully aware of the fraud, but allowed it to continue without interruption.

16.    Over the course of several years, Relator as well as other physicians have brought these fraudulent billing practices to TeamHealth's attention on both a local and national level. Indeed, Relator approached TeamHealth Medical Director Dr. Sonya Pease on many occasions, starting as early as 2010, and explained the rampant fraud being committed by TeamHealth and the impact it was having on TeamHealth patients. To date, Relator is unaware of any action taken by Dr. Pease or TeamHealth to prevent the fraudulent billing practice being conducted at TeamHealth affiliated hospitals and clinics, or to return the ill-gotten gains obtained from the scheme.

17.    In fact, the only action taken by Dr. Pease and TeamHealth following the reporting of both Relator that rampant fraud existed within TeamHealth generally, and within the All Saints hospital system in particular, was to terminate them. Relator was commonly known throughout the hospital as one of the best, most experienced anesthesiologist at All Saints, but TeamHealth determined that it had to sever its ties with him before he continued to threaten this fraudulent revenue source. TeamHealth put its profits ahead of its patients, protecting this unlawful practice that continues to this day. TeamHealth fostered a culture of fear at All Saints, as well as its other facilities across the country.

6

18.     In sum, from at least 2010 and continuing to the date of this filing, TeamHealth has presented and continues to present false and fraudulent claims to federal and state health insurance agencies reflecting the presence, supervision, and direction of attending physicians for certain claimed medical services, despite the fact that TeamHealth knows that its attending physicians were not present, supervising, or directing those services as it represented to the Government, and as is required for payment. All such claims presented to the United States Government for payment violate the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*.

19.     This is also an action to recover double and treble damages and civil penalties on behalf of the States arising from the conduct of Defendants who made false or fraudulent claims, statements and records relating to payments made by health insurance programs funded by States, including Medicaid.

20.     Relator also asserts a related claim on his own behalf pursuant to 31 U.S.C. § 3730(h) for unlawful retaliation and seeks appropriate statutory penalties and relief under that section.

## PARTIES

21.     Relator Dr. John Mamalakis is a medical doctor, board certified in anesthesiology, who resides in the State of Wisconsin and practices anesthesiology in Wisconsin. Relator was formerly a staff anesthesiologist at All Saints Hospital in Racine and an employee of Defendants Anesthetix Management, LLC, d/b/a Anesthesia of TeamHealth, and Racine Anesthesia Services, LLC.

22.     Defendant Anesthetix Management, LLC ("Anesthetix") is a Delaware limited liability company, doing business as Anesthetix of TeamHealth, wholly owned by Defendant TeamHealth Holdings, Inc. ("TeamHealth"). Anesthetix is in the business of providing anesthesia care to patients at hospitals and clinics in ten states, including at All Saints in Racine, Wisconsin.

7

23.     TeamHealth is a Delaware Corporation headquartered in Knoxville, TN that owns and operates Defendant Anesthetix, as well as other TeamHealth anesthesia facilities, including TeamHealth Anesthesia Management Services, Inc. and West Division of TeamHealth Anesthesia, in states across the country including California, Colorado, Delaware, Florida, Georgia, Hawaii, Iowa, Kansas, Maryland, Michigan, Nevada, Nebraska, New Jersey, North Carolina, Oregon, Oklahoma, Tennessee, Texas, Wisconsin, and the District of Columbia, among other states.

24.     Dr. Sonya Pease is a medical doctor anesthesiologist who is employed by TeamHealth.

25.     Dr. John Ippolito is a medical doctor anesthesiologist who practices or has practiced at All Saints Hospital and was employed by TeamHealth.

26.     Dr. Howard Stroupe is a medical doctor anesthesiologist who practices or has practiced at All Saints Hospital and was employed by TeamHealth.

27.     Dr. Jaqueline Peters is a medical doctor anesthesiologist who practices or has practiced at All Saints Hospital and is employed by TeamHealth.

28.     Dr. Sammy Dean is a medical doctor anesthesiologist who practices or has practiced at All Saints Hospital and was employed by TeamHealth.

29.     Dr. Edward J. Lee is a medical doctor anesthesiologist who practices or has practiced at All Saints Hospital and was employed by TeamHealth.

## JURISDICTION AND VENUE

30.     The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345.  The Court may exercise personal jurisdiction over the Defendants pursuant to 31 U.S.C. §§ 3732(a).

31.     This Court has supplemental jurisdiction over the counts relating to the state false

8

claims acts pursuant to 28 U.S.C. §1367.

32.     Venue is proper in the Eastern District of Wisconsin under 31 U.S.C. §§ 3732 and 28 U.S.C. §§ 1391(b) and (c) because the Defendants transact business in this District.

33.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint has been filed *in camera* and will remain under seal for a period of at least 60 days and shall not be served on the Defendants until the Court so orders.

34.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in their possession contemporaneous with the filing of the Complaint. Relator has complied with this provision by serving copies of this Complaint upon the Honorable James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and upon the Honorable Eric H. Holder, Attorney General of the United States.

35.     Relator is not aware that the allegations in this Complaint have been publicly disclosed. Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures. In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" because he has provided their information voluntarily to the Government before filing this Complaint, and has knowledge which is both direct and independent of any public disclosures to the extent they may exist.

## FEDERALLY FUNDED HEALTH INSURANCE PROGRAMS

A.     Medicare

    i.     Medicare Background

36.     Medicare is a federally-funded health insurance program for the elderly and persons with certain disabilities, providing both hospital insurance, Medicare Part A, which covers the cost

9

of inpatient hospital services and post-hospital nursing facility care, and medical insurance, Medicare Part B, which covers the cost of the physician's services such as services to patients who are hospitalized, if the services are medically necessary and personally provided by the physician.

37. Medicare payments come from the Medicare Trust Fund, which is funded primarily by payroll deductions taken from the United States work force through mandatory Social Security deductions.

38. Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services. CMS establishes rules for the day-to-day administration of Medicare. CMS contracts with private companies to handle day-to-day administration of Medicare.

39. CMS, through contractors, maintains and distributes fee schedules for the payment of physician services. These schedules specify the amounts payable for defined types of medical services and procedures.

40. Medicare provides for the services of anesthesiologists to be paid based upon three main rates: (1) personally performed, (2) medically directed, or (3) medically supervised.

41. The personally performed rate entitles the physician to claim an unreduced physician fee. It applies where the physician personally performs the anesthesia services, or monitors the work of a CRNA, Anesthetist Assistant, or resident on a one-to-one basis. 42 C.F.R. 415.172.

42. To qualify for the personally performed rate, the physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. *Id.* The claimant must maintain documentation that indicates the teaching physician's presence during all critical or key portions of the anesthesia procedure and the immediate availability of another teaching anesthesiologist. *Id.*

10

43.    The "medically directed" rate applies where the physician is directing two, three, or four anesthesia cases being performed by CRNAs, Anesthesia Assistants, or residents.

44.    Medicare permits payment for anesthesia services at the "medically directed" rate if and only if the physician's services meet the following seven conditions:

>    i)      Performs a pre-anesthetic examination and evaluation;
>
>    ii)     Prescribes the anesthesia plan;
>
>    iii)    Personally participates in the most demanding aspects of the anesthesia plan including, if applicable, induction and emergence;
>
>    iv)     Ensures that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified individual as defined in operating instructions;
>
>    v)      Monitors the course of anesthesia administration at frequent intervals;
>
>    vi)     Remains physically present and available for immediate diagnosis and treatment of emergencies; and
>
>    vii)    Provides indicated post-anesthesia care.

42 C.F.R. 415.110 (a).

45.    The physician alone must document and attest in the patient's medical record that the seven conditions have been satisfied, "specifically documenting that he or she performed the pre-anesthetic exam and evaluation, provided the indicated post-anesthesia care, and was present during the most demanding procedures, including induction and emergence where applicable." 42 C.F.R. 415.110 (b).

46.    Medicare regulations further permit a provider to bill a service as "medically directed" only if the physician is directing anesthesia services in no more than four concurrent cases. 42 C.F.R. 415.110 (a). If the physician is directing a student nurse anesthetist in any of the

11

cases, the physician may not direct more than two cases concurrently. 42 C.F.R. 414.46(d).

47.    The "medically supervised" rate applies where the physician is either directing more than four concurrent procedures or is performing other services while directing four or fewer procedures, or where the physician fails to perform any one of the seven requirements for medical direction.

48.    The Medicare program requires that Part B claims for anesthesia services be submitted using the American Medical Association's Current Procedural Terminology ("CPT") Codes. Claimants are required to provide accurate CPT Codes on all claims submitted for payment, including as follows:

> a. For anesthesia services personally furnished by an anesthesiologist, including services provided by faculty anesthesiologists involving a resident, the physician uses the "AA" modifier. Medicare provides payments at the unreduced physician fee rate. For certain produces, a CRNA can also claim anesthesia services performed by the CRNA without the medical direction of a physician using the "QZ" modifier.
>
> b. For anesthesia services performed when an anesthesiologist and CRNA are involved in a single procedure and the physician is performing the medical direction, the physician uses the "QY" modifier and the CRNA uses the QX modifier. Further, for medical direction by a physician of two, three, or four concurrent anesthesia services, the physician uses the QK modifier.
>
> c. For medical supervision by a physician of more than four concurrent anesthesia services, the claimant uses the AD modifier, which provides for payment below what is provided for medically directed anesthesia services.

12

**B.**   Medicaid

49.   Medicaid is a state and federal assistance program to provide payment of medical expenses for low-income patients. Medicaid was created in 1965 in Title XIX of the Social Security Act.

50.   Funding for Medicaid is shared between the federal government and state programs that choose to participate in Medicaid.

51.   At all relevant times to the Complaint, applicable Medicaid regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

**C.**   TRICARE

52.   TRICARE is a federal program which provides civilian health benefits for military personnel, military retirees, and their families. TRICARE is administered by the Department of Defense and funded by the federal government.

53.   At all relevant times to the Complaint, applicable TRICARE regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

54.   Medicare, Medicaid, and TRICARE, and other similar federal programs are referred to collectively herein as "federal health insurance programs."

**SPECIFIC ALLEGATIONS**

**I.**   TEAMHEALTH'S FALSE BILLING SCHEME

55.   From at least 2010 to the filing of this Complaint, TeamHealth and its officers, agents, and employees engaged in a systematic effort to understaff its hospitals and clinics and to knowingly and recklessly file false claims with federally and state funded health insurance programs

13

that do not reflect the actual services performed by its attending physicians.

A.    **TeamHealth Anesthesia Services and its Takeover of Anesthetix**

56.    Founded in 1979, TeamHealth has grown to become one of the largest providers of hospital-based clinical outsourcing companies in the world, offering hospitals third-party clinical support in emergency medicine, hospital medicine, and anesthesia, among others.

57.    Over the last few years, TeamHealth has experienced enormous growth, acquiring numerous other smaller outsourcing providers across the country.

58.    One sector that has experienced particularly substantial expansion is its anesthesia program. In just the last five years, TeamHealth has acquired dozens of smaller, regional anesthesia groups across the country.

59.    In January 2010, TeamHealth acquired Anesthetix, a nationally recognized provider of comprehensive anesthesiology and pain management service solutions to hospitals and surgery centers throughout the United States headquartered in Palm Beach Gardens, FL.

60.    Around that time, Anesthetix obtained a contract to manage the anesthesia operations at All Saints, replacing Southeastern Anesthesia Consultants ("Southeastern"). Publicly, All Saints made the change to Anesthetix because the hospital's needs had outgrown Southeastern's capabilities. Internally, however, Relator is aware that internal conflict between Southeastern and All Saints motivated the move to Anesthetix.

61.    Within a few weeks, TeamHealth hired five new doctors for the anesthesia practice, and about fourteen new CRNAs.

62.    Following the turnover, All Saints, under the guidance of TeamHealth, as Anesthetix, implemented a new policy at the hospital for delivering anesthesia to patients and billing for it, by which All Saints would use CRNAs to perform the procedure rather than anesthesiologists. Under

14

this new program, All Saints became primarily a "medical direction" anesthesia facility – allowing CRNAs to perform a bigger share of the responsibilities.

63.     On January 10, 2010, TeamHealth officers, including TeamHealth Medical Director Dr. Sonya Pease, provided an orientation to the anesthesia doctors and CRNAs. At the orientation, Dr. Pease instructed the staff to document each procedure with the goal of fitting it within the Medicare guidelines for medical direction. When asked to be more specific, Dr. Pease explained that the anesthesiologists would need to sign the anesthesia record every fifteen minutes indicating that they had checked in on the patient. The physicians, including Relator, understood her instruction to mean that they should sign the anesthesia record as if they were there for regular fifteen minute intervals, even if they were not actually present at these regular intervals.

64.     Accordingly, TeamHealth at All Saints converted the entire anesthesia program to 100% medical direction across the board – no procedure or operation was performed in which the anesthesiologist was regularly present, and most procedures were performed by the CRNAs. Indeed, this new system was designed to allow TeamHealth anesthesiologist to perform more procedures concurrently, and bill for the procedures in accordance with the regulatory framework outlined above.

B.     **Relator's Employment with TeamHealth at All Saints**

65.     Relator began working as an anesthesiologist at All Saints in June 2008 for Southeastern. At the time, Southeastern had an exclusive contract to provide the anesthetics at All Saints, and it was an M.D. practice only, i.e. there were no CRNAs.

66.     At the beginning of 2010, at the recommendation of All Saints Operating Room Director Barbara Harris, All Saints awarded a contract to Anesthetix which became TeamHealth. Harris was subsequently hired as a TeamHealth consultant.

15

67. At the recommendation of All Saints, Relator was asked to join TeamHealth and stay with All Saints, and he accepted the offer of a position.

68. Relator continued to work for TeamHealth at All Saints until his termination for reporting the fraud described herein in 2012.

## C. TeamHealth at All Saints Improperly Billed Medicare and Medicaid for Nearly Every Procedure Requiring Anesthesia at the Hospital

69. During the course of his employment with TeamHealth, Relator became aware that TeamHealth anesthesiologists at All Saints were not properly performing each of the seven pre-requisites for billing Medicare under medical direction for any of the procedures requiring anesthesia. Among the most blatant violations were: 1) the failure to perform pre-anesthetic examinations and evaluations; 2) the failure to properly prepare an anesthesia plan; 3) failure to personally participate in the most demanding procedures; and 4) failure to monitor the administration of anesthesia at frequent intervals.

### 1. TeamHealth Anesthesiologists Failed to Perform Pre-Anesthetic examinations and Evaluations

70. Relator has personal knowledge that TeamHealth anesthesiologists, including Dr. Ippolito, Dr. Lee, Dr. Stroupe, Dr. Dean, and Dr. Peters, routinely failed to properly perform a pre-anesthetic exam and evaluation prior to delivering anesthesia to the patient.

71. In general, Defendants allowed the CRNAs to do all pre-anesthetic exams and evaluations on patients. The anesthesiologists then only consulted with the CRNA and approved the reports filled out by the nurses, upon a superficial, cursory review. In fact, the above named anesthesiologists often signed the evaluations without having reviewed them at all, or without examining the patient to confirm the patient's fitness for the anesthesia plan prescribed by the nurse, or the type of anesthesia to be administered. Almost universally, the pre-screening by the defendant

16

anesthesiologists did not conform with the type of examinations required for billing under medical direction.

72. Relator is personally aware of several instances in which a patient suffered harm that can be directly attributed to the failure to conduct a pre-anesthetic exam.

73. In one particularly egregious case, the anesthesiologist failed to complete a mandatory pre-operative airway exam where the patient had a difficult airway passage. The problem was not discovered until after induction, creating an avoidable crisis situation. Relator has personal knowledge of similar incidents in which patients were not given a proper exam and their airway was represented on an evaluation as clear, when in fact, they had very serious obstructions. Relator is informed and believes, however, that TeamHealth billed Medicare for medical direction in these cases.

74. As a direct result this failure to perform the pre-anesthetic exam and evaluation, the anesthesiologists caused numerous false claims to be submitted by TeamHealth which billed Medicare for medical direction despite failing to fulfill one of its seven requirements.

75. Further, TeamHealth knew that its doctors were not performing the examinations and evaluations but it billed under the medical direction anyway, in violation of the FCA and the state false claims acts.

76. As a result of this fraud the Government and the States have suffered substantial damages upon payment of these improper claims to TeamHealth.

2. **TeamHealth Anesthesiologists Routinely Failed to Prescribe an Anesthesia Plan**

77. Relator has personal knowledge that TeamHealth also billed Medicare and Medicaid when it knew that its anesthesiologists, including Dr. Ippolito, Dr. Lee, Dr. Stroupe, Dr. Dean, and

Dr. Peters, did not prescribe an anesthesia plan in violation of the Medicare regulations for billing under medical direction.

78.     Anesthesia plans at All Saints were routinely created by CRNAs, not anesthesiologists, but TeamHealth billed for "medical direction" anyway in direct violation of Medicare guidelines.

79.     In fact, the expectation at All Saints for TeamHealth anesthesiologists and CRNAs was that the CRNAs always prescribed the anesthesia plan, and often never even discussed it with the doctors. Indeed, TeamHealth Medical Director Sonya Pease told Relator directly that he should avoid micromanaging the CRNAs and let them put together the anesthesia plan. Relator was also told that he would be insulting the CRNAs by scrutinizing the anesthesia plan prescribed by them.

80.     The resistance to allow physicians to develop and implement the anesthesia plan was constant at All Saints under TeamHealth, and it was encouraged by Dr. Pease as the routine pattern and practice of TeamHealth.

81.     The failure of doctors to prescribe an anesthesia plan put patients at unnecessary risk, and, in some cases, resulted in additional harm to the patient.

82.     As a result of this regular practice of failing to personally prescribe an anesthesia plan, the TeamHealth anesthesiologists caused false claims to be submitted for payment under medical direction.

83.     TeamHealth knew that its anesthesiologists were not properly prescribing an anesthesia plan, but billed under medical supervision anyway, in violation of the FCA and the state false claims acts.

84.     Due to this fraud, the Government has paid hundreds to thousands of improper claims to TeamHealth for procedures that did not qualify under the guidelines.

3.      **TeamHealth Anesthesiologists Rarely Participated in All of the Most Demanding Procedures**

85.     Relator is also personally aware that TeamHealth anesthesiologists, including Dr. Ippolito, Dr. Lee, Dr. Stroupe, Dr. Dean, and Dr. Peters, did not personally participate in each of the most demanding procedures for nearly every operation requiring anesthesia that TeamHealth billed the Government for under medical direction.

86.     In fact, the TeamHealth anesthesiologists were generally only present for induction, but never for emergence, as well as other critical procedures in the anesthesia plan. Induction is the period between the initial administration of the induction agents and loss of consciousness. Emergence is the transition process where a patient goes from general anesthesia to awake and spontaneously breathing.

87.     The failure of TeamHealth anesthesiologists to be present and immediately available during the most demanding procedures throughout the anesthesia plan put patients at risk.

88.     In some specific procedures, the anesthesiologist would be absent for the entire procedure after induction. For example, with caesarean sections, the surgery was in another part of the hospital all together. In many cases, the anesthesiologist would administer the spinal (often they did not even do that), but would not return at all for the remainder of the procedure, in clear violation of the Medicare guidelines.

89.     Indeed, as a matter of practice, OB epidurals were administered by the CRNAs independently of any supervision by the physicians. In these cases, no pre-procedure examination was performed by anesthesiologist, nor did the anesthesiologist engage in any discussion about the patient or prescribe an anesthesia plan; rather, the CRNAs provided the anesthesia care without the

19

medical direction of an anesthesiologist. Nevertheless, TeamHealth billed at the higher rate of medical direction by anesthesiologists.

90.     Similarly, the cardiac catheterization lab was on the complete opposite side of the hospital, and therefore, in some cases, particularly procedures requiring only sedation, the defendant anesthesiologists would not be there at all, and rarely even saw the patient before the procedure.

91.     The failure to be present for these procedures was a regular practice for TeamHealth anesthesiologist at All Saints. In fact, Relator was specifically told by the above named doctors that he made them look bad by participating in both induction and emergence for each and every procedure he worked on.

92.     In many cases, physicians were not present at the hospital and "directed" CRNAs from afar without the ability to personally assess the particular situation and the patient. Relator has personal knowledge that anesthesiologists were at home, on a boat, sitting in an office combing the internet, or traveling in different states, yet TeamHealth billed for medical direction. This practice put patients at greater risk of harm, and in some cases actually resulted in harm to patients.

93.     In one case, Dr. Ippolito, not present as he should have been, was called during an emergence and extubation of an obese patient having a high risk thoracic surgery. Upon the request for his assistance, Dr. Ippolito instructed the CRNA to "just pull out the tube." Realizing that this would likely kill the patient, the CRNA wisely called Dr. David Lane and asked for his guidance. Dr. Lane, instead of Dr. Ippolito, came to the hospital and proceeded with a meticulous extubation that included sitting up the patient and extubating him awake. Dr. Lane stated: "the patient would have died on the spot if [the CRNA] would have just pulled out the tube."

94.     The TeamHealth anesthesiologists caused false claims to be submitted to the Government by TeamHealth for medical direction when they did not participate in all of the most demanding procedures of the anesthesia plan as described above.

95.     In addition, TeamHealth violated the false claims act by knowingly billing for medical direction when it knew that the anesthesiologists were not participating in all of the most demanding procedures of the anesthesia plan as described above.

96.     As a result of this fraudulent conduct, the Government has suffered substantial damages for the reimbursement of the false claims submitted to it by TeamHealth.

4.     <u>TeamHealth Anesthesiologists Did Not Monitor the anesthesia administration at frequent intervals</u>

97.     Relator has personal knowledge that TeamHealth anesthesiologists, including Dr. Ippolito, Dr. Lee, Dr. Stroupe, Dr. Dean, and Dr. Peters, routinely failed to monitor the administration of anesthesia at regular, frequent intervals.

98.     In fact, TeamHealth anesthesiologists monitored the administration of anesthesia only intermittently, if at all, in violation of the Medicare guidelines.

99.     Relator had frequent conversations with CRNAs who shared with him that it became the standard practice that other doctors did not return for the procedure following induction. Relator was also directly told by the anesthesiologists named above that they rarely, if ever, monitored their patients after induction.

100.     Indeed, the anesthesia record contained a line for the anesthesiologist to initial to show that he or she was monitoring at regular intervals. Relator has personal knowledge, through his own observations as well as discussions with CRNAs, that the above named anesthesiologists even falsely represented on the anesthesia record, by retroactively signing in after the procedure was

21

over, or before the cases started by initialing in advance, that they had been there every fifteen minutes. Relator was told by the CRNAs that he was the only anesthesiologist that actually monitored the patients and the administration of the anesthesia at regular intervals.

101.    In fact, due to the regular practice of TeamHealth anesthesiologists of abstaining from regularly monitoring patients, CRNAs often told Relator that he was not needed at all for the procedure. Of course, Relator, along with the other doctors, was aware of the Medicare guidelines and its requirements that they monitor at frequent intervals. Relator ignored the suggestion by the CRNAs while many of the other anesthesiologist followed it.

102.    The general understanding among the doctors, including Dr. Ippolito, Dr. Stroupe, Dr. Lee, Dr. Peters, and Dr. Dean, as expressed to Relator by them, was that it was an unwritten rule that All Saints was a CNRA driven practice, and the nurses, therefore, should be able to make the decisions and manage the program.

103.    As a result of this regular practice of failing to monitor the administration of the anesthetic at frequent intervals, the TeamHealth anesthesiologists caused false claims to be submitted for payment under medical direction.

104.    TeamHealth knew that its anesthesiologists were not regularly monitoring the administration of anesthesia, but billed under medical supervision anyway, in violation of the FCA and the state false claims acts.

105.    Due to this fraud, the Government has paid hundreds of improper claims to TeamHealth for procedures that did not qualify under the guidelines.

**D.    The Fraud is Being Committed at other TeamHealth Centers**

106.    TeamHealth is a profit-driven healthcare provider that shapes its policies and strategies as any business does – on revenue growth and profits.

22

107. Relator is informed and believes that TeamHealth engages in fraudulent billing at its other facilities across the country to fulfill this goal.

108. As discussed above, in furtherance of TeamHealth's profit-driven objective and as it has at other centers, clinics, and hospitals across the country, TeamHealth immediately, upon acquisition of Anesthetix, converted All Saints to a 100% medical direction, CRNA driven anesthesia practice which allowed it to pay less for doctors, but earn more from Medicare and Medicaid. Similar take overs and conversions were implemented at clinics and hospitals owned and managed by TeamHealth across the country.

109. Throughout his time at All Saints, Relator, as well as some CRNAs, regularly reported to TeamHealth Chief Medical officer Dr. Sonya Pease that widespread fraud was being committed at All Saints. Dr. Pease, however, instructed them on numerous occasions not to report the fraud to the hospital because it could jeopardize TeamHealth's contract. Knowledge of the fraud, thus, permeated the highest levels of TeamHealth. Indeed, on more than one occasion, Relator spoke directly with TeamHealth CEO Dr. Steve Gottlieb and informed him of the fraud being committed at All Saints.

110. Furthermore, Relator is informed and believes that similar frauds were being perpetrated at other TeamHealth facilities. For example, in Saginaw, Michigan, TeamHealth Anesthesia, Relator has knowledge that rampant billing fraud of similar nature has taken place for several years. At this facility, physicians and CRNAs, like at All Saints, routinely bill for medical direction when procedures would only be eligible for medical supervision. In fact, Relator is informed and believes that in at least 25 percent of cases, anesthesiologists at the Saginaw facility are not present for induction, and they do not check in during a procedure as a matter of practice.

111. In another example, Dr. Sonya Pease stated on numerous occasions that the

23

Portland, Oregon practice, Portland Anesthesia Specialists, LLC, specifically, but all practices generally, was run in the same fraudulent manner as All Saints – that is, by billing on medical direction for all procedures, no matter how unlikely or impossible it was under the circumstances for the procedure to qualify for the higher rate. Doctors at the Oregon facility as well have shared with Relator that extensive fraudulent billing practices are being committed at that facility by the anesthesia group under the direction of TeamHealth.

112.     Finally, at the Wolverine Anesthesia Consultants facility in Orlando, Florida, TeamHealth is committing similar Medicare and FCA violations, including billing for medical direction when procedures are only eligible for medical supervision. For example, Relator learned that student nurse anesthesiologists are performing craniotomy (brain surgery) cases with no CRNA with them after only three months of clinical training and minimal anesthesia supervision from the physicians. The center regularly bills under medical direction for these services despite the dearth of involvement from physicians.

113.     TeamHealth is a business designed to make money, in part, by taking advantage of the Medicare and Medicaid system. Accordingly, when Relator reported the violations and the fraud described above repeatedly to Dr. Pease and Dr. Gottlieb, they failed to act. Dr. Pease, along with the rest of the TeamHealth management needed to protect the company and its profits. TeamHealth officers knew that if they allowed Relator to expose the daily Medicare fraud being committed by TeamHealth, that it would affect their bottom-line, and it would lose the contract to provide the services to All Saints and the other TeamHealth facilities. So, they covered it up, and fired Relator.

114.     TeamHealth had knowledge of the rampant fraud being perpetrated at the All Saints facility and at other facilities across the country.

24

E.    **TeamHealth's Retaliation against Employees who Questioned TeamHealth's Practices**

115.    When physicians raised questions about TeamHealth's billing practices with TeamHealth management or raised patient care issues relating to TeamHealth's understaffing, those physicians were dismissed or their contracts have not been renewed.

116.    Soon after TeamHealth took over the anesthesia group at All Saints, Relator continued reporting the Medicare violations to senior officials to Anesthetix of TeamHealth.

117.    Dr. Pease visited the hospital on several occasions throughout the year following the transition to TeamHealth, and each time she visited, Relator reported the fraud.

118.    In April 2011, after himself having reported certain issues with patient care and billing issues to TeamHealth, then Medical Director Dr. David Lane was given notice of his termination. He was replaced by Dr. Ippolito as Medical Director of the entire program, while Dr. Stroupe was made Chief of Cardiac Anesthesia. At that point, Dr. Lane, while still Chairman, notified Dr. Mamalakis and told him that he will be fired because he had been honest about the fraud being perpetrated by TeamHealth.

119.    Relator continued to report to Dr. Pease that the group was committing fraud. Throughout 2010 and 2011, Relator informed Dr. Stroupe that he had been committing fraud by not following the Medicare guidelines and allowing the hospital to bill under full "medical direction" for his services.

120.    In June 2011, Dr. Ippolito vaguely informed Relator that what TeamHealth is going to do him was wrong, but he was powerless to stop it and needed to keep his own job.

121.    The following month, in July 2011, Dr. Stroupe warned Relator that he would be fired. Immediately, Relator called Dr. Pease who later informed him that Dr. Stroupe would apologize, and asked if he would forget it if he did. Relator agreed.

122. Just a few weeks later, however, Relator was terminated for cause based on an incident in which he had acted properly and in the best interest of the patient, but that TeamHealth used as a basis for terminating him based on his reporting of fraud internally.

### COUNT I
### SCHEME TO SUBMIT FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A))

123. All of the preceding allegations are incorporated herein.

124. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

125. As a result of Defendants' acts, the United States has been damaged, and continues to be damages, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

### COUNT II
### SUBMISSION OF CLAIMS CONTAINING FALSE EXPRESS ORIMPLIED CERTIFICATIONS (31 U.S.C. § 3729(a)(1)(A))

126. All of the preceding allegations are incorporated herein.

127. As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by defendant – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

128. As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from

Defendants' unlawful conduct as described herein.

## COUNT III
## FALSE RECORDS FOR PAYMENT (31 U.S.C. § 3729(a)(1)(B))

129.    All of the preceding allegations are incorporated herein..

130.    Defendants submitted false records or statements to the Government representing that Defendants were entitled to payment and approval for health care services provided to beneficiaries of federal health insurance programs, including, among other things: Medically directed anesthesia services performed in operating rooms and other medical facilities when in fact such services did not meet the criteria for medical direction.

131.    All such false records or statements were knowingly made to the Government to get false or fraudulent claims paid or approved by the Government.

132.    Defendant thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

## COUNT IV
## FALSE CLAIMS CONSPIRACY (31 U.S.C. § 3729(a)(1)(C))

133.    All of the preceding allegations are incorporated herein.

134.    Defendants entered into a conspiracy or conspiracies through their member physicians, officers, and employees to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for health care services provided to beneficiaries of federal health insurance programs, for among other things: Medically directed anesthesia services performed in operating rooms and other medical facilities when in fact such services did not meet the criteria for medical direction.

135.    Defendants also conspired through their member physicians, officers, and employees to omit disclosing or to actively conceal facts which, if known, would have reduced the

27

federal government's obligations to pay them or would have required them to repay the federal government.

**COUNT V**
**FALSE RECORDS TO AVOID REFUND (31 U.S.C. § 3729(a)(1)(G))**

136.    All of the preceding allegations are incorporated herein.

137.    By virtue of the acts alleged herein the Defendants knowingly made, used or caused to be made or used false records or false statements that are material to an obligation to pay or transmit money to the Government.

**COUNT VI**
**RETALIATION (31 U.S.C. § 3730(h))**

138.    All of the preceding allegations are incorporated herein.

139.    By virtue of the acts alleged herein, Defendants threatened, harassed, and/or dismissed, and/or discriminated against, Relator in the terms and conditions of his employment after lawfully reported what he believed to be fraudulent conduct or wrongdoing to his superiors in violation of 31 U.S.C. § 3730(h).

140.    Relator seeks compensatory damages and other appropriate statutory relief pursuant to this section.

**COUNT VII**
**(California False Claims Act)**
**(Cal. Govt. Code §§ 12651 et seq.)**

141.    All of the preceding allegations are incorporated herein.

142.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

143.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California

28

State Government to approve and pay such false and fraudulent claims.

144. The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

145. By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

146. Pursuant to Cal. Govt. Code § 12651(a), the State of California is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT VIII**
**(Colorado Medicaid False Claims Act)**
**(C.R.S. § 25.5-4-303.5. et seq.)**

147. All of the preceding allegations are incorporated herein.

148. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

149. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

150. The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

29

151.     By reason of the Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

152.     Pursuant to C.R.S. § 25.5-4-305, the State of Colorado is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

COUNT IX
(Delaware False Claims and Reporting Act)
(Del Code Ann. tit. 6, §§ 1201 et seq.)

153.     All of the preceding allegations are incorporated herein.

154.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

155.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

156.     The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

157.     By reason of the Defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

158.     Pursuant to Del Code Ann. tit. 6, § 1201(a), the State of Delaware is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or

30

presented by Defendants.

**COUNT X**
**(Florida False Claims Act)**
**(Fla. Stat. Ann. §§ 68.081 et seq.)**

159.    All of the preceding allegations are incorporated herein.

160.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

161.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

162.    The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

163.    By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

164.    Pursuant to Fla. Stat. Ann. § 68.082(2), the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XI**
**(Georgia False Medicaid Claims Act)**
**(Ga. Code. Ann. §§ 49-4-168.1 et seq.)**

165.    All of the preceding allegations are incorporated herein.

166.    By virtue of the acts described above, Defendants knowingly presented or caused to

31

be presented, false or fraudulent claims to the Georgia State Government for payment or approval.

167. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Georgia State Government to approve and pay such false and fraudulent claims.

168. The Georgia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

169. By reason of the Defendants' acts, the State of Georgia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

170. Pursuant to Ga. Code. Ann. § 49-4-168.1(a), the State of Georgia is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

COUNT XII
(Hawaii False Claims Act)
(Haw. Rev. Stat. §§ 661-21 et seq.)

171. All of the preceding allegations are incorporated herein.

172. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

173. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

174. The Hawaii State Government, unaware of the falsity of the records, statements and

claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

175. By reason of the Defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

176. Pursuant to Haw. Rev. Stat. § 661-21(a), the State of Hawaii is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XIII**
**(Iowa False Claims Act)**
**(Iowa Code Ann. §§ 685.1, et seq.)**

252. All of the preceding allegations are incorporated herein.

253. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Iowa State Government for payment or approval.

254. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Iowa State Government to approve and pay such false and fraudulent claims.

255. The Iowa State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

256. By reason of the Defendants' acts, the State of Iowa has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

33

257.    Pursuant to Iowa Code Ann. § 685.2, the State of Iowa is entitled to three times the amount of actual damages plus at least $5,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XIV**
**(Maryland False Health Claims Act)**
**(Maryland Code Ann. §§ 2-601, et seq.)**

252.    All of the preceding allegations are incorporated herein.

253.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Maryland State Government for payment or approval.

254.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the Maryland State Government to approve and pay such false and fraudulent claims.

255.    The Maryland State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

256.    By reason of the Defendants' acts, the State of Maryland has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

257.    Pursuant to Maryland Code Ann. § 2-602, the State of Iowa is entitled to three times the amount of actual damages plus at least $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XV**
**(Michigan Medicaid False Claims Act)**
**(Mich. Comp. Laws §§ 400.601 et seq.)**

177.    All of the preceding allegations are incorporated herein.

178.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Michigan for payment or approval.

179.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

180.     The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

181.     By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

182.     Pursuant to Mich. Stat. § 400.612, the State of Michigan is entitled to a civil penalty equal to the full amount received by the person benefiting from the fraud, three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XVI**
**(Nevada False Claims Act)**
**(Nev. Rev. Stat. §§ 357.010 et seq.)**

183.     All of the preceding allegations are incorporated herein.

184.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

185.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

186.     The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

187.     By reason of the Defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

188.     Pursuant to Nev. Rev. Stat. § 357.040(1), the State of Nevada is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

COUNT XVII
(New Jersey False Claims Act)
(N.J. Stat. Ann. §§ 2A:32C-1 et seq.)

189.     All of the preceding allegations are incorporated herein.

190.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

191.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

192.     The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

193.    By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

194.    Pursuant to N.J. Stat. Ann. § 2A:32C-3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty allowed under the federal False Claims Act, 31 U.S.C. § 3729, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XVIII
### (North Carolina False Claims Act)
### (N.C. Gen. Stat. Ann. 52 §1-605, et seq.)

300.    All of the preceding allegations are incorporated herein.

301.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the North Carolina State Government for payment or approval.

302.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted and/or falsified material facts, to induce the North Carolina State Government to approve and pay such false and fraudulent claims.

303.    The North Carolina State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

304.    By reason of the Defendants' acts, the State of North Carolina has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

305.    Pursuant to N.C. Gen. Stat. Ann. 52 § 1-607, the State of North Carolina is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every

37

false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XIX**
**(Oklahoma Medicaid False Claims Act)**
**(63 Okla. St. Ann. §§ 5053 et seq.)**

195.    All of the preceding allegations are incorporated herein.

196.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Oklahoma State Government for payment or approval.

197.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Oklahoma State Government to approve and pay such false and fraudulent claims.

198.    The Oklahoma State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

199.    By reason of Defendants' acts, the State of Oklahoma has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

200.    Pursuant to 63 Okl. St. Ann. § 5053.1(B), the State of Oklahoma is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

38

## COUNT XX
## (Tennessee Medicaid False Claims Act)
## (Tenn. Code Ann. §§ 71-5-181 et seq.)

201. All of the preceding allegations are incorporated herein.

202. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

203. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

204. The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

205. By reason of Defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

206. Pursuant to Tenn. Code § 71-5-182(a)(1), the State of Tennessee is entitled to three times the amount of actual damages plus the maximum penalty of $25,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXI
## (Texas Medicaid Fraud Prevention Law)
## (Tex. Hum. Res. Code Ann. § 36.002)

207. All of the preceding allegations are incorporated herein.

208. By virtue of the acts described above, Defendants knowingly presented or caused to

Case 2:14-cv-00349-DEJ   Filed 03/27/14   Page 40 of 46   Document 1

be presented, false or fraudulent claims to the Texas State Government for payment or approval.

209.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

210.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

211.    By reason of the Defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

212.    Pursuant to Tex. Hum. Res. Code Ann. § 36.052, the State of Texas is entitled to two times the amount of actual damages plus the maximum penalty of $15,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XXII**
**(Wisconsin False Claims for Medical Assistance Law)**
**(Wisc. Stat. § 20.931)**

213.    All of the preceding allegations are incorporated herein.

214.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

215.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Wisconsin State Government to approve and pay such false and fraudulent claims.

40

216.    The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

217.    By reason of the Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

218.    Pursuant to Wisc. Stat. § 20.931(2), the State of Wisconsin is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

**COUNT XXIII**
**(District of Columbia False Claims Act)**
**(D.C. Code Ann. §§ 2-308.03 et seq.)**

219.    All of the preceding allegations are incorporated herein.

220.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

221.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

222.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

41

223. By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

224. Pursuant to D.C. Code Ann. § 2-308.14, the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally, as to the federal claims:

A. Three times the amount of damages that the Government sustains because of the acts of Defendants;

B. A civil penalty of $11,000 for each violation;

C. An award to the Qui Tam Plaintiff for collecting the civil penalties and damages;

D. Award of an amount for reasonable expenses necessarily incurred;

E. Award of the Qui Tam Plaintiff's reasonable attorneys' fees and costs;

F. Interest;

G. Such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including: (1) two times the amount of back pay with appropriate interest; (2) compensation for special damages sustained by Relator in an amount to be determined at trial; (3) litigation costs and reasonable attorneys' fees; (4) such punitive damages as may be awarded under applicable law; and (5) reasonable attorneys' fees and litigation costs in connection with Relator's Section H claim;

42

H.    Such further relief as the Court deems just.

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally, as to the State claims:

A.    Relator and each named State Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by each State as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants within each State, all as provided by:

> Cal. Govt. Code § 12651;
> C.R.S. § 25.5-4-305;
> 6 Del. C. § 1201;
> Fla. Stat. Ann. § 68.082;
> Ga. Code Ann. § 49-4-168.1;
> Haw. Rev. Stat. § 661-21;
> Iowa Code Ann. § 685.2;
> Maryland Code Ann. § 2-604;
> Mich. Comp. Laws § 400.612;
> N.J. Stat. Ann. § 2A:32C-3;
> Nev. Rev. Stat. Ann. § 357.040;
> N.C. Gen. Stat. Ann. 52 §1-607;
> 63 Okla. St. Ann. § 5053.1;
> Tenn. Code Ann. § 71-5-182;
> Wisc. Stat. § 20.931(2); and
> D.C. Code Ann. § 2-308.14;

B.    Relator and Plaintiff State of Texas be awarded statutory damages in an amount equal to two times the amount of actual damages that Texas has sustained as a result of the Defendants' actions within Texas, as well as the maximum statutory civil penalty for each violation of Tex. Hum. Res. Code Ann. § 36.052;

C.    Relator be awarded his relator's share of any judgment to the maximum amount provided pursuant to:

> Cal. Govt. Code § 12652(g)(2);
> C.R.S. § 25.5-4-305;

43

> 6 Del. C. § 1205;
> Fla. Stat. Ann. § 68.085;
> Ga. Code. Ann. § 49-4-168.2(i);
> Haw. Rev. Stat. § 661-27;
> Iowa Code Ann. § 685.2;
> Maryland Code Ann. § 2-604;
> Mich. Comp. Laws § 400.610a;
> Nev. Rev. Stat. Ann. § 357.210;
> N.J. Stat. Ann. § 2A:32C-7;
> N.C. Gen. Stat. Ann. 52 §1-610;
> 63 Okla. St. Ann. § 5053.4;
> Tenn. Code Ann. § 71-5-183;
> Wisc. Stat. § 20.931(11); and
> D.C. Code Ann. § 2-308.15;

D.     Relator be awarded all costs and expenses associated with each of the pendent State

claims, plus attorney's fees as provided pursuant to:

> Cal. Govt. Code § 12652(g)(8);
> C.R.S. § 25.5-4-305;
> 6 Del. C. § 1205;
> Fla. Stat. Ann. § 68.086;
> Ga. Code. Ann. § 49-4-168.2(i);
> Haw. Rev. Stat. § 661-27;
> Iowa Code Ann. § 685.2
> Mich. Comp. Laws § 400.610a;
> Nev. Rev. Stat. Ann. § 357.180;
> N.J. Stat. Ann. § 2A:32C-8;
> N.C. Gen. Stat. Ann. 52 §1-605;
> 63 Okla. St. Ann. § 5053.4;
> Tenn. Code Ann. § 71-5-183;
> Wisc. Stat. § 20.931(11); and
> D.C. Code Ann. § 2-308.15;

E.     Relator and the State Plaintiffs be awarded such other and further relief as the Court

may deem to be just and proper.

44

**JURY DEMAND**

Relator hereby demands trial by jury.

Dated: March 25, 2013

PARKER ROSEN, LLC

By: _____

     Daniel N. Rosen  (Reg. No. 1094765)
     888 Colwell Building
     123 North Third Street
     Minneapolis, MN 55401
     Telephone:  (612) 767-3000
     rosen@parkerrosen.com

STONE & MAGNANINI LLP

David S. Stone (admission pending)
David B. Harrison (admission pending)
Attorneys for Relator
Stone & Magnanini LLP
150 John F. Kennedy Pkwy, Fourth Floor
Short Hills, NJ 07078
Telephone:  (973) 218-1111
dstone@stonemagnalaw.com
dharrison@stonemagnalaw.com

45