# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF WISCONSIN

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **Case No. 14-CV-00349** |
| **STATE OF CALIFORNIA, STATE OF** | ) | |
| **STATE OF COLORADO, STATE OF** | ) | |
| **DELAWARE, STATE OF FLORIDA** | ) | |
| **STATE OF GEORGIA, STATE OF** | ) | |
| **HAWAII, STATE OF IOWA, STATE OF** | ) | |
| **MARYLAND, STATE OF MICHIGAN** | ) | |
| **STATE OF NEVADA, STATE OF NEW** | ) | |
| **JERSEY, STATE OF NORTH** | ) | |
| **CAROLINA, STATE OF OKLAHOMA** | ) | **SECOND AMENDED COMPLAINT** |
| **STATE OF TENNESSEE, STATE OF** | ) | |
| **TEXAS, STATE OF WISCONSIN,** | ) | |
| **DISTRICT OF COLUMBIA** | ) | |
| *ex rel.* **JOHN MAMALAKIS M.D.** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **ANESTHESTIX MANAGEMENT,** | ) | |
| **LLC, D/B/A ANESTHETIX OF** | ) | |
| **TEAMHEALTH, TEAMHEALTH** | ) | |
| **HOLDINGS, INC., and** | ) | |
| **Other Unknown Defendants Does 1-100,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>COMPLAINT</u>

On behalf of the United States of America, the State of California, the State of Colorado, the

State of Florida, the State of Michigan, the State of New Jersey, the State of Wisconsin, and the

District of Columbia (collectively, the "States"), Plaintiffs and Relator John Mamalakis M.D. file

this *qui tam* Complaint against Defendants Anesthestix Management, LLC, D/B/A Anesthetix of

TeamHealth ("Anesthetix"), and TeamHealth Holdings (individually, or collectively

"TeamHealth"), Inc., and allege as follows:

1

## SUMMARY OF THE ALLEGATIONS

1.      This is an action to recover treble damages and civil penalties on behalf of the United States of America and the States in connection with a scheme perpetrated by TeamHealth to maximize income from its anesthesia practices by knowingly and recklessly submitting false claims to federal and state health insurance programs for physician services that TeamHealth knows do not meet Medicare's billing conditions for such services, in violation of the False Claims Act ("FCA") and the false claims acts of the States.

2.      TeamHealth is one "of the nation's largest providers of hospital-based clinical outsourcing" with an operating philosophy that is "essentially the same as when [it] started," remaining "committed to a patient-centric model of healthcare delivery with hospitals, physician groups and TeamHealth working collaboratively to deliver compassionate, effective, efficient and safe patient care."  TeamHealth has over 6,200 affiliated healthcare professionals  nationwide, performing services in multiple disciplines including Anesthesia, Hospital Medicine, and Emergency Medicine.

3.      TeamHealth anesthesia services, in particular, are a major driver of revenue for the company nationwide.  In 2013, anesthesia services made up 10% of the entire company's consolidated net revenues, or approximately $240 million.

4.      Approximately 50% of TeamHealth's patient base is made up of Medicare and Medicaid program participants, and the company derives approximately 40% of its net revenues from these sources.

5.      From at least 2010 through the present, TeamHealth, both as its predecessor Anesthetix and, following a 2010 merger, as TeamHealth, routinely submitted false claims to Medicare, Medicaid, and TriCare for reimbursement of non-existent or non-reimbursable services

2

purportedly performed at Wheaton Franciscan Healthcare- All Saints Hospital ("All Saints") in Racine, Wisconsin as well as other TeamHealth affiliated hospitals and clinics in California, Florida, Georgia, Michigan, New Jersey, Wisconsin, and the District of Columbia, among other states.

6.      TeamHealth typically bills Medicare for the services of its anesthesiologists under "medical direction," rather than "medical supervision."  Medical direction provides that the anesthesiologist may bill for services concurrently with the Certified Registered Nurse Anesthetists ("CRNA") at a higher rate if seven specific services are performed throughout the procedure, for a maximum of four concurrent anesthesia procedures; whereas, if any of the seven services have not been performed, or the anesthesiologist performs more than four concurrent procedures, Medicare must be billed at the lower rate for medical supervision, not the higher rate for medical direction.

7.      Relator has personal knowledge that, as part of the scheme, TeamHealth anesthesiologists  are or were typically not available and knowingly did not perform many of the steps required to medically direct such services, and nearly 100% of the time do or did not perform at least one of the following steps, all of which are required for services to be considered "medically directed" by Medicare:  (a) perform a pre-anesthetic examination and evaluation, (b) personally participate in the most demanding aspects of the anesthesia plan, (c) monitor the anesthesia at frequent intervals, (d) remain physically present and available for immediate diagnosis and treatment of emergencies, and (e) provide indicated post-anesthesia care.

8.      The conduct of TeamHealth and the negligence of many of its anesthesiologists reflects a complete institutional abandonment of their patients and nurses.  In some instances, the absence of the TeamHealth anesthesiologists at All Saints' operating rooms and ICUs has placed the patients' lives at unnecessary risk.  Further, when an unsupervised CRNA performs care independently of the anesthesiologist, TeamHealth is not permitted to submit claims to the

3

Government for the higher physician fee schedule rate because such claims do not meet the billing conditions of Medicare Part B.

9.      However, Relator has personal knowledge that TeamHealth routinely submitted and continues to submit false claims to federal and state health insurance programs that do not reflect its actual physician services, but rather falsely represent to the Government that TeamHealth anesthesiologists are present for, perform, or direct procedures when they have had minimal, if any, involvement in those procedures.  In this way, TeamHealth is cutting its costs to provide medical services while illegally maintaining or increasing revenue by falsifying its billing.

10.     Specifically, Relator has personally observed TeamHealth conduct the following routine and systematic false claims practices:

11.     **Pre-anesthetic examination and evaluation:** Since at least 2010, TeamHealth has routinely submitted and continues to routinely submit false claims for the anesthesiology services at All Saints, and several other TeamHealth facilities, when it knew that the anesthesiologist failed to properly perform an examination and evaluation prior to delivering the anesthetic to the patient. Indeed, the physician defendants never auscultated, examined the heart or lungs, or examined the airway, all required examinations prior to delivering an anesthetic to the patient, and in order to properly prescribe an anesthesia plan for major surgery as discussed below.  Relator has personal knowledge that the failure to conduct such a routine examination resulted in the submission of false claims to the government health insurance programs, including Medicare, Medicaid, and TriCare, and, in some cases, direct patient harm.

12.     **Prescribes the anesthesia plan:** Since at least 2010, TeamHealth has routinely submitted and continues to routinely submit false claims for the anesthesiology services at All Saints, and several other TeamHealth facilities,  when it knew that the anesthesiologist failed to prescribe a

4

proper anesthesia plan. Relator has personal knowledge that the failure to properly prescribe an anesthesia plan resulted in the submission of false claims to the government health insurance programs, including Medicare, Medicaid, and TriCare, and, in some cases, direct patient harm.

13. **Personally Participation in Demanding Procedures**: Since at least 2010, TeamHealth has routinely submitted and continues to routinely submit false claims for the anesthesiology services at All Saints, and several other TeamHealth facilities, when it knew that the anesthesiologist failed to participate, or even be present for emergence or anytime during the emergence period, as well as other critical events during the anesthesia procedure. Relator has personal knowledge that the failure to personally participate in the most demanding anesthesia procedures by anesthesiologists resulted in the submission of false claims to the government health insurance programs, including Medicare, Medicaid, and TriCare, and, in some cases, direct patient harm.

14. **Monitors the anesthesia administration at frequent intervals:** Since at least 2010, TeamHealth has routinely submitted and continues to routinely submit false claims for the anesthesiology services at All Saints, and several other TeamHealth facilities, when it knew that the anesthesiologist regularly failed to monitor the continued administration of anesthesia at frequent intervals. Indeed, Relator is personally aware that anesthesiologists were encouraged to, and did, falsify the anesthesia record to indicate that they regularly monitored the administration of anesthesia when they in fact did not conduct any such monitoring. Relator has personal knowledge that the failure to monitor the administration of anesthesia at frequent intervals resulted in the submission of false claims to the government health insurance programs, including Medicare, Medicaid, and TriCare, and, in some cases, direct patient harm.

15. Relator has personal knowledge that TeamHealth perpetrated this fraud at All Saints,

5

as well as other TeamHealth affiliated hospitals and clinics across the country, and has personal knowledge that TeamHealth officials were fully aware of the fraud, but allowed it to continue without interruption.

16.     Over the course of several years, Relator as well as other physicians have brought these fraudulent billing practices to TeamHealth's attention on both a local and national level. Indeed, Relator approached TeamHealth Medical Director Dr. Sonya Pease on many occasions, starting as early as 2010, and explained the rampant fraud being committed by TeamHealth and the impact it was having on TeamHealth patients. To date, Relator is unaware of any action taken by Dr. Pease or TeamHealth to prevent the fraudulent billing practice being conducted at TeamHealth affiliated hospitals and clinics, or to return the ill-gotten gains obtained from the scheme.

17.     In fact, the only action taken by Dr. Pease and TeamHealth following the reporting of both Relator that rampant fraud existed within TeamHealth generally, and within the All Saints hospital system in particular, was to terminate them. Relator was commonly known throughout the hospital as one of the best, most experienced anesthesiologist at All Saints, but TeamHealth determined that it had to sever its ties with him before he continued to threaten this fraudulent revenue source. TeamHealth put its profits ahead of its patients, protecting this unlawful practice that continues to this day. TeamHealth fostered a culture of fear at All Saints, as well as its other facilities across the country.

18.     In sum, from at least 2010 and continuing to the date of this filing, TeamHealth has presented and continues to present false and fraudulent claims to federal and state health insurance agencies reflecting the presence, supervision, and direction of attending physicians for certain claimed medical services, despite the fact that TeamHealth knows that its attending physicians were not present, supervising, or directing those services as it represented to the Government, and as is

required for payment. All such claims presented to the United States Government for payment violate the Federal False Claims Act, 31 U.S.C. § 3729, *et seq*.

19.     This is also an action to recover double and treble damages and civil penalties on behalf of the States arising from the conduct of Defendants who made false or fraudulent claims, statements and records relating to payments made by health insurance programs funded by States, including Medicaid.

20.     Relator also asserts a related claim on his own behalf pursuant to 31 U.S.C. § 3730(h) for unlawful retaliation and seeks appropriate statutory penalties and relief under that section.

## PARTIES

21.     Relator Dr. John Mamalakis is a medical doctor, board certified in anesthesiology, who resides in the State of Wisconsin and practices anesthesiology in Wisconsin. Relator was formerly a staff anesthesiologist at All Saints Hospital in Racine and an employee of Defendants Anesthetix Management, LLC, d/b/a Anesthesia of TeamHealth, and Racine Anesthesia Services, LLC.

22.     Defendant Anesthetix Management, LLC ("Anesthetix") is a Delaware limited liability company, doing business as Anesthetix of TeamHealth, wholly owned by Defendant TeamHealth Holdings, Inc. ("TeamHealth"). Anesthetix is in the business of providing anesthesia care to patients at hospitals and clinics in ten states, including at All Saints in Racine, Wisconsin.

23.     TeamHealth is a Delaware Corporation headquartered in Knoxville, TN that owns and operates Defendant Anesthetix, as well as other TeamHealth anesthesia facilities, including TeamHealth Anesthesia Management Services, Inc. and West Division of TeamHealth Anesthesia, in states across the country including California, Florida, Michigan, New Jersey, Wisconsin, and the District of Columbia, among other states.

7

## JURISDICTION AND VENUE

24.     The Court has subject matter jurisdiction to entertain this action under 28 U.S.C. §§ 1331 and 1345.  The Court may exercise personal jurisdiction over the Defendants pursuant to 31 U.S.C. §§ 3732(a).

25.     This Court has supplemental jurisdiction over the counts relating to the state false claims acts pursuant to 28 U.S.C. §1367.

26.     Venue is proper in the Eastern District of Wisconsin under 31 U.S.C. §§ 3732 and 28 U.S.C. §§ 1391(b) and (c) because the Defendants transact business in this District.

27.     Pursuant to 31 U.S.C. § 3730(b)(2), the Relator must provide the Government with a copy of the Complaint and/or a written disclosure of substantially all material evidence and material information in their possession contemporaneous with the filing of the Complaint.  Relator has complied with this provision by serving copies of this Complaint upon the Honorable James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and upon the Honorable Eric H. Holder, Attorney General of the United States.

28.     Relator is not aware that the allegations in this Complaint have been publicly disclosed.  Further, to the extent Relator is aware of any public disclosures, this Complaint is not based on such public disclosures.  In any event, this Court has jurisdiction under 31 U.S.C. § 3730(e)(4) because the Relator is an "original source" because he has provided their information voluntarily to the Government before filing this Complaint, and has knowledge which is both direct and independent of any public disclosures to the extent they may exist.

8

## FEDERALLY FUNDED HEALTH INSURANCE PROGRAMS

**A.**     **Medicare**

      **i.**     **Medicare Background**

29.     Medicare is a federally-funded health insurance program for the elderly and persons with certain disabilities, providing both hospital insurance, Medicare Part A, which covers the cost of inpatient hospital services and post-hospital nursing facility care, and medical insurance, Medicare Part B, which covers the cost of the physician's services such as services to patients who are hospitalized, if the services are medically necessary and personally provided by the physician.

30.     Medicare payments come from the Medicare Trust Fund, which is funded primarily by payroll deductions taken from the United States work force through mandatory Social Security deductions.

31.     Medicare is generally administered by the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services. CMS establishes rules for the day-to-day administration of Medicare. CMS contracts with private companies to handle day-to-day administration of Medicare.

32.      CMS, through contractors, maintains and distributes fee schedules for the payment of physician services. These schedules specify the amounts payable for defined types of medical services and procedures.

33.     Medicare provides for the services of anesthesiologists to be paid based upon three main rates: (1) personally performed, (2) medically directed, or (3) medically supervised.

34.     The personally performed rate entitles the physician to claim an unreduced physician fee. It applies where the physician personally performs the anesthesia services, or monitors the work of a CRNA, Anesthetist Assistant, or resident on a one-to-one basis. 42 C.F.R.

9

415.172.

35.     To qualify for the personally performed rate, the physician must be present during all critical portions of the procedure and immediately available to furnish services during the entire service or procedure. *Id.* The claimant must maintain documentation that indicates the teaching physician's presence during all critical or key portions of the anesthesia procedure and the immediate availability of another teaching anesthesiologist. *Id.*

36.     The "medically directed" rate applies where the physician is directing two, three, or four anesthesia cases being performed by CRNAs, Anesthesia Assistants, or residents.

37.     Medicare permits payment for anesthesia services at the "medically directed" rate if and only if the physician's services meet the following seven conditions:

> i)      Performs a pre-anesthetic examination and evaluation;
>
> ii)     Prescribes the anesthesia plan;
>
> iii)    Personally participates in the most demanding aspects of the anesthesia plan including, if applicable, induction and emergence;
>
> iv)     Ensures that any procedures in the anesthesia plan that he or she does not perform are performed by a qualified individual as defined in operating instructions;
>
> v)      Monitors the course of anesthesia administration at frequent intervals;
>
> vi)     Remains physically present and available for immediate diagnosis and treatment of emergencies; and
>
> vii)    Provides indicated post-anesthesia care.

42 C.F.R. 415.110 (a).

38.     The physician alone must document and attest in the patient's medical record that the seven conditions have been satisfied, "specifically documenting that he or she performed the

pre-anesthetic exam and evaluation, provided the indicated post-anesthesia care, and was present during the most demanding procedures, including induction and emergence where applicable." 42 C.F.R. 415.110 (b).

39.     Medicare regulations further permit a provider to bill a service as "medically directed" only if the physician is directing anesthesia services in no more than four concurrent cases. 42 C.F.R. 415.110 (a). If the physician is directing a student nurse anesthetist in any of the cases, the physician may not direct more than two cases concurrently. 42 C.F.R. 414.46(d).

40.     The "medically supervised" rate applies where the physician is either directing more than four concurrent procedures or is performing other services while directing four or fewer procedures, or where the physician fails to perform any one of the seven requirements for medical direction.

41.     The Medicare program requires that Part B claims for anesthesia services be submitted using the American Medical Association's Current Procedural Terminology ("CPT") Codes. Claimants are required to provide accurate CPT Codes on all claims submitted for payment, including as follows:

    a.  For anesthesia services personally furnished by an anesthesiologist, including services provided by faculty anesthesiologists involving a resident, the physician uses the "AA" modifier. Medicare provides payments at the unreduced physician fee rate. For certain produces, a CRNA can also claim anesthesia services performed by the CRNA without the medical direction of a physician using the "QZ" modifier.

    b.  For anesthesia services performed when an anesthesiologist and CRNA are involved in a single procedure and the physician is performing the medical

11

direction, the physician uses the "QY" modifier and the CRNA uses the QX

modifier. Further, for medical direction by a physician of two, three, or four

concurrent anesthesia services, the physician uses the QK modifier.

c. For medical supervision by a physician of more than four concurrent anesthesia

services, the claimant uses the AD modifier, which provides for payment below

what is provided for medically directed anesthesia services.

**B.** **Medicaid**

42. Medicaid is a state and federal assistance program to provide payment of medical

expenses for low-income patients. Medicaid was created in 1965 in Title XIX of the Social Security

Act.

43. Funding for Medicaid is shared between the federal government and state programs

that choose to participate in Medicaid.

44. At all relevant times to the Complaint, applicable Medicaid regulations relating to

coverage of claims by providers and physicians have been substantially similar in all material

respects to the applicable Medicare provisions described above.

**C.** **TRICARE**

45. TRICARE is a federal program which provides civilian health benefits for military

personnel, military retirees, and their families. TRICARE is administered by the Department of

Defense and funded by the federal government.

46. At all relevant times to the Complaint, applicable TRICARE regulations relating to

coverage of claims by providers and physicians have been substantially similar in all material

respects to the applicable Medicare provisions described above.

47. Medicare, Medicaid, and TRICARE, and other similar federal programs are referred

12

to collectively herein as "federal health insurance programs."

<b><u>SPECIFIC ALLEGATIONS</u></b>

## I.      TEAMHEALTH'S FALSE BILLING SCHEME

48.      From at least 2010 to the filing of this Complaint, TeamHealth and its officers, agents, and employees engaged in a systematic effort to understaff its hospitals and clinics and to knowingly and recklessly file false claims with federally and state funded health insurance programs that do not reflect the actual services performed by its attending physicians.

### A.      TeamHealth Anesthesia Services and its Takeover of Anesthetix

49.      Founded in 1979, TeamHealth has grown to become one of the largest providers of hospital-based clinical outsourcing companies in the world, offering hospitals third-party clinical support in emergency medicine, hospital medicine, and anesthesia, among others.

50.      Over the last few years, TeamHealth has experienced enormous growth, acquiring numerous other smaller outsourcing providers across the country.

51.      One sector that has experienced particularly substantial expansion is its anesthesia program.  In just the last five years, TeamHealth has acquired dozens of smaller, regional anesthesia groups across the country.

52.      In January 2010, Anesthetix obtained a contract to manage the anesthesia operations at All Saints, replacing Southeastern Anesthesia Consultants ("Southeastern").  Publicly, All Saints made the change to Anesthetix because the hospital's needs had outgrown Southeastern's capabilities.  Internally, however, Relator is aware that internal conflict between Southeastern and All Saints motivated the move to Anesthetix.

53.      In January 2011, TeamHealth acquired Anesthetix, a nationally recognized provider of comprehensive anesthesiology and pain management service solutions to hospitals and surgery

13

centers throughout the United States headquartered in Palm Beach Gardens, FL.

54.     Within a few weeks, TeamHealth hired five new doctors for the anesthesia practice, and about fourteen new CRNAs.

55.     Following the turnover, All Saints, under the guidance of TeamHealth, as Anesthetix, implemented a new policy at the hospital for delivering anesthesia to patients and billing for it, by which All Saints would use CRNAs to perform the procedure rather than anesthesiologists.  Under this new program, All Saints became primarily a "medical direction" anesthesia facility – allowing CRNAs to perform a bigger share of the responsibilities.

56.     On January 10, 2010, TeamHealth officers, including TeamHealth Medical Director Dr. Sonya Pease, provided an orientation to the anesthesia doctors and CRNAs.  At the orientation, Dr. Pease instructed the staff to document each procedure with the goal of fitting it within the Medicare guidelines for medical direction.  When asked to be more specific, Dr. Pease explained that the anesthesiologists would need to sign the anesthesia record every fifteen minutes indicating that they had checked in on the patient.  The physicians, including Relator, understood her instruction to mean that they should sign the anesthesia record as if they were there for regular fifteen minute intervals, even if they were not actually present at these regular intervals.

57.     Accordingly, TeamHealth at All Saints converted the entire anesthesia program to 100% medical direction across the board – no procedure or operation was performed in which the anesthesiologist was regularly present, and most procedures were performed by the CRNAs. Indeed, this new system was designed to allow TeamHealth anesthesiologist to perform more procedures concurrently, and bill for the procedures in accordance with the regulatory framework outlined above.

14

**B.      Relator's Employment with TeamHealth at All Saints**

58.      Relator began working as an anesthesiologist at All Saints in June 2008 for Southeastern.  At the time, Southeastern had an exclusive contract to provide the anesthetics at All Saints, and it was an M.D. practice only, i.e. there were no CRNAs.

59.      At the beginning of 2010, at the recommendation of All Saints Operating Room Director Barbara Harris, All Saints awarded a contract to Anesthetix which became TeamHealth. Harris was subsequently hired as a TeamHealth consultant.

60.      At the recommendation of All Saints, Relator was asked to join TeamHealth and stay with All Saints, and he accepted the offer of a position.

61.      Relator continued to work for TeamHealth at All Saints until his termination for reporting the fraud described herein in 2011.

**C.      TeamHealth at All Saints Improperly Billed Medicare and Medicaid for Nearly Every Procedure Requiring Anesthesia at the Hospital**

62.      During the course of his employment with TeamHealth, Relator became aware that TeamHealth anesthesiologists at All Saints were not properly performing each of the seven pre-requisites for billing Medicare under medical direction for any of the procedures requiring anesthesia.  Among the most blatant violations were: 1) the failure to perform pre-anesthetic examinations and evaluations; 2) the failure to properly prepare an anesthesia plan; 3) failure to personally participate in the most demanding procedures; and 4) failure to monitor the administration of anesthesia at frequent intervals.

**1.      TeamHealth Anesthesiologists Failed to Perform Pre-Anesthetic examinations and Evaluations**

63.      Relator has personal knowledge that TeamHealth anesthesiologists routinely failed to properly perform a pre-anesthetic exam and evaluation prior to delivering anesthesia to the patient.

15

64.     In general, Defendants allowed the CRNAs to do all pre-anesthetic exams and evaluations on patients.  The anesthesiologists then only consulted with the CRNA and approved the reports filled out by the nurses, upon a superficial, cursory review.  In fact, the above named anesthesiologists often signed the evaluations without having reviewed them at all, or without examining the patient to confirm the patient's fitness for the anesthesia plan prescribed by the nurse, or the type of anesthesia to be administered.  Almost universally, the pre-screening by the defendant anesthesiologists did not conform with the type of examinations required for billing under medical direction.

65.     Relator is personally aware of several instances in which a patient suffered harm that can be directly attributed to the failure to conduct a pre-anesthetic exam.

66.     In one particularly egregious case, the anesthesiologist failed to complete a mandatory pre-operative airway exam where the patient had a difficult airway passage.  The problem was not discovered until after induction, creating an avoidable crisis situation.  Relator has personal knowledge of similar incidents in which patients were not given a proper exam and their airway was represented on an evaluation as clear, when in fact, they had very serious obstructions. Relator is informed and believes, however, that TeamHealth billed Medicare for medical direction in these cases.

67.     As a direct result this failure to perform the pre-anesthetic exam and evaluation, the anesthesiologists caused numerous false claims to be submitted by TeamHealth which billed Medicare for medical direction despite failing to fulfill one of its seven requirements.

68.     Further, TeamHealth knew that its doctors were not performing the examinations and evaluations but it billed under the medical direction anyway, in violation of the FCA and the state false claims acts.

69.     As a result of this fraud the Government and the States have suffered substantial damages upon payment of these improper claims to TeamHealth.

### 2.     TeamHealth Anesthesiologists Routinely Failed to Prescribe an Anesthesia Plan

70.     Relator has personal knowledge that TeamHealth also billed Medicare and Medicaid when it knew that its anesthesiologists did not prescribe an anesthesia plan in violation of the Medicare regulations for billing under medical direction.

71.     Anesthesia plans at All Saints were routinely created by CRNAs, not anesthesiologists, but TeamHealth billed for "medical direction" anyway in direct violation of Medicare guidelines.

72.     In fact, the expectation at All Saints for TeamHealth anesthesiologists and CRNAs was that the CRNAs always prescribed the anesthesia plan, and often never even discussed it with the doctors.  Indeed, TeamHealth Medical Director Sonya Pease told Relator directly that he should avoid micromanaging the CRNAs and let them put together the anesthesia plan.  Relator was also told that he would be insulting the CRNAs by scrutinizing the anesthesia plan prescribed by them.

73.     The resistance to allow physicians to develop and implement the anesthesia plan was constant at All Saints under TeamHealth, and it was encouraged by Dr. Pease as the routine pattern and practice of TeamHealth.

74.     The failure of doctors to prescribe an anesthesia plan put patients at unnecessary risk, and, in some cases, resulted in additional harm to the patient.

75.     As a result of this regular practice of failing to personally prescribe an anesthesia plan, the TeamHealth anesthesiologists caused false claims to be submitted for payment under medical direction.

17

76.     TeamHealth knew that its anesthesiologists were not properly prescribing an anesthesia plan, but billed under medical supervision anyway, in violation of the FCA and the state false claims acts.

77.     Due to this fraud, the Government has paid hundreds to thousands of improper claims to TeamHealth for procedures that did not qualify under the guidelines.

### 3.     TeamHealth Anesthesiologists Rarely Participated in All of the Most Demanding Procedures

78.     Relator is also personally aware that TeamHealth anesthesiologists did not personally participate in each of the most demanding procedures for nearly every operation requiring anesthesia that TeamHealth billed the Government for under medical direction.

79.     In fact, the TeamHealth anesthesiologists were generally only present for induction, but never for emergence, as well as other critical procedures in the anesthesia plan.  Induction is the period between the initial administration of the induction agents and loss of consciousness. Emergence is the transition process where a patient goes from general anesthesia to awake and spontaneously breathing.

80.     The failure of TeamHealth anesthesiologists to be present and immediately available during the most demanding procedures throughout the anesthesia plan put patients at risk.

81.     In some specific procedures, the anesthesiologist would be absent for the entire procedure after induction.  For example, with caesarean sections, the surgery was in another part of the hospital all together.  In many cases, the anesthesiologist would administer the spinal (often they did not even do that), but would not return at all for the remainder of the procedure, in clear violation of the Medicare guidelines.

18

82.     Indeed, as a matter of practice, OB epidurals were administered by the CRNAs independently of any supervision by the physicians.  In these cases, no pre-procedure examination was performed by anesthesiologist, nor did the anesthesiologist engage in any discussion about the patient or prescribe an anesthesia plan; rather, the CRNAs provided the anesthesia care without the medical direction of an anesthesiologist.  Nevertheless, TeamHealth billed at the higher rate of medical direction by anesthesiologists.

83.     Similarly, the cardiac catheterization lab was on the complete opposite side of the hospital, and therefore, in some cases, particularly procedures requiring only sedation, the defendant anesthesiologists would not be there at all, and rarely even saw the patient before the procedure.

84.     The failure to be present for these procedures was a regular practice for TeamHealth anesthesiologist at All Saints.  In fact, Relator was specifically told by the above named doctors that he made them look bad by participating in both induction and emergence for each and every procedure he worked on.

85.     In many cases, physicians were not present at the hospital and "directed" CRNAs from afar without the ability to personally assess the particular situation and the patient.  Relator has personal knowledge that anesthesiologists were at home, on a boat, sitting in an office combing the internet, or traveling in different states, yet TeamHealth billed for medical direction.  This practice put patients at greater risk of harm, and in some cases actually resulted in harm to patients.

86.     In one case, Dr. John Ippolito, MD, not present as he should have been, was called during an emergence and extubation of an obese patient having a high risk thoracic surgery.  Upon the request for his assistance, Dr. Ippolito instructed the CRNA to "just pull out the tube." Realizing that this would likely kill the patient, the CRNA wisely called Dr. David Lane and asked for his guidance.  Dr. Lane, instead of Dr. Ippolito, came to the hospital and proceeded with a

19

meticulous extubation that included sitting up the patient and extubating him awake. Dr. Lane stated: "the patient would have died on the spot if [the CRNA] would have just pulled out the tube."

87.     The TeamHealth anesthesiologists caused false claims to be submitted to the Government by TeamHealth for medical direction when they did not participate in all of the most demanding procedures of the anesthesia plan as described above.

88.     In addition, TeamHealth violated the false claims act by knowingly billing for medical direction when it knew that the anesthesiologists were not participating in all of the most demanding procedures of the anesthesia plan as described above.

89.     As a result of this fraudulent conduct, the Government has suffered substantial damages for the reimbursement of the false claims submitted to it by TeamHealth.

**4.     TeamHealth Anesthesiologists Did Not Monitor the anesthesia administration at frequent intervals**

90.     Relator has personal knowledge that TeamHealth anesthesiologists routinely failed to monitor the administration of anesthesia at regular, frequent intervals.

91.     In fact, TeamHealth anesthesiologists monitored the administration of anesthesia only intermittently, if at all, in violation of the Medicare guidelines.

92.     Relator had frequent conversations with CRNAs who shared with him that it became the standard practice that other doctors did not return for the procedure following induction. Relator was also directly told by the anesthesiologists named above that they rarely, if ever, monitored their patients after induction.

93.     Indeed, the anesthesia record contained a line for the anesthesiologist to initial to show that he or she was monitoring at regular intervals. Relator has personal knowledge, through his own observations as well as discussions with CRNAs, that the above named anesthesiologists

20

even falsely represented on the anesthesia record, by retroactively signing in after the procedure was over, or before the cases started by initialing in advance, that they had been there every fifteen minutes. Relator was told by the CRNAs that he was the only anesthesiologist that actually monitored the patients and the administration of the anesthesia at regular intervals.

94.     In fact, due to the regular practice of TeamHealth anesthesiologists of abstaining from regularly monitoring patients, CRNAs often told Relator that he was not needed at all for the procedure. Of course, Relator, along with the other doctors, was aware of the Medicare guidelines and its requirements that they monitor at frequent intervals. Relator ignored the suggestion by the CRNAs while many of the other anesthesiologist followed it.

95.     The general understanding among the doctors as expressed to Relator by them, was that it was an unwritten rule that All Saints was a CNRA driven practice, and the nurses, therefore, should be able to make the decisions and manage the program.

96.     As a result of this regular practice of failing to monitor the administration of the anesthetic at frequent intervals, the TeamHealth anesthesiologists caused false claims to be submitted for payment under medical direction.

97.     TeamHealth knew that its anesthesiologists were not regularly monitoring the administration of anesthesia, but billed under medical supervision anyway, in violation of the FCA and the state false claims acts.

98.     Due to this fraud, the Government has paid hundreds of improper claims to TeamHealth for procedures that did not qualify under the guidelines.

**D.     Relator Has Personal Knowledge of Multiple Instances Where TeamHealth Anesthesiologists' Actions Violated Government Billing Requirements**

99.     Throughout his tenure, Relator personally observed multiple instances where

TeamHealth anesthesiologists' actions violated government billing requirements, yet the Defendans improperly billed.

100.     Relator has provided these as representative examples of the Defendants' custom and practice of egregiously failing to follow government regulations and Medical Direction requirements.

101.     To maintain the anonymity of the patients involved and to avoid any concerns of violating the Health Insurance Portability and Accountability Act of 1996, Relator did not retain copies of any documents related to these events, and will describe these incidents without revealing personal details.  Records confirming the facts alleged are kept in the regular course of  business by Defendants, including Anesthesia Records, Surgical Records and other documentation required for such procedures.

102.     Each of the following examples involved patients who were insured by government payors (Medicaid and/or Medicare) and whose procedures and treatments are known to have been billed to the Government.

103.     In June, 2011, Dr. Edward Lee claimed to be medically directing three rooms, including one general surgery room, one urology room and one hysterectomy procedure. However, Dr. Lee left the hospital between 11:00 AM and 12:00 noon, and spent the remainder of the afternoon waiting at his residence for the delivery of a new piano. Relator was made aware of Dr. Lee's absence after he received a call from Dr. Karl Disque, a recently hired physician, who was already supervising two rooms and knew that he would not be able to supervise Dr. Lee's three additional rooms, as doctors can only bill for medical direction for no more than four rooms at once. Dr. Lee signed and billed for medically directing the rooms, even while he was absent at home, claiming that he was present throughout, periodically monitored the procedures, and was

22

immediately available in case of complications.

104.     In late Spring or early Summer, 2010, CRNA Colette Fitzpatrick contacted Relator to express her concern that no anesthesiologists were present in the hospital while she was performing a high-risk procedure involving an elderly Medicare patient. Dr. Sharon Gordon was supposed to be at the hospital providing medical direction. However, CRNA Fitzpatrick stated that when she contacted Dr. Sharon Gordon and asked about her location, Dr. Gordon claimed that she had left the hospital to prepare her horses for a show that weekend, and would not be returning.

105.     In Spring, 2010, Dr. Jacqueline Peters claimed to be providing medical direction at 8:30 AM in an OR in Racine, Wisconsin. However, Dr. Peters contacted Relator from Illinois, asking him to enter an operating room assigned to her and treat a patient's low blood pressure during a total hip replacement.  Dr. Peters had left the hospital immediately after induction and was not present for the remainder of the procedures, nor did she return for the remainder of the day, yet she signed and billed for medical direction.

106.     Similarly, in Fall, 2010, Dr. Peters billed for providing medical direction in two rooms when she wasn't at the hospital. When Medical Director Sonya Pease arrived for a surprise visit and Dr. Peters was not in the hospital, Relator had to call Dr. Peters and inform her that she needed to return to the hospital immediately.

107.     In March, 2010, Dr. Bernard Wittels was supposed to be present in the operating rooms, monitoring cataract operations on several elderly Medicare patients with Dr. Platt, a surgeon. However, Dr. Wittels never once entered any of the rooms during the cases. When Relator reviewed Dr. Wittels' charts for a quality meeting, he saw that Dr. Wittels had signed the record, claiming to have been present in the operating room and monitoring the patient.  Dr. Wittels even claimed to have been monitoring the patient at a time that was actually 15 minutes after the surgery had ended

23

and the *patient* was no longer present. Upon further review and discussion with Dr. Wittels, Dr. Wittels admitted to Relator that he never goes into the rooms, but simply signs for and logs his time beforehand as if he is present, even though he is actually not present at those later times of the procedure and therefore would not qualify to bill for Medical Direction.

108.     In May, 2011,  Dr. John Ippolito was supposed to be performing an electrophysiology study with Dr. Margot Vloka in the Cardiac Catheterization Lab. As this was a long and difficult procedure, Relator contacted CRNA Shea Hensley to ask if he needed a break. CRNA Hensley reported that he had, without any supervision from Dr. Ippolito, performed the pre-anesthetic examination and evaluation, prescribed the plan, and induced the patient. CRNA Hensley also stated that Dr. Ippolito never arrived during the entirety of the entire case.  Furthermore, CRNA Hensley reported that he had performed two previous cases that day with Dr. Vloka, but hadn't seen Dr. Ippolito at those procedures either.

109.     Similarly, in April, 2011, CRNA Mary Ann Perry informed relator that Dr. Ippolito had slept through a 2:00 AM emergency appendectomy, never seeing the patient before, during, or after the case.

110.     In Spring, 2011, Dr. Howard Stroupe billed for medically directing a knee arthroscopy with Dr. Lange.  When the patient experienced distress, CRNA Flowers called Dr. Stroupe to come to the room.  Dr. Stroupe did not come, so CRNA Flowers called Relator to come. When Relator later asked why Dr. Stroupe was not present, CRNA Flowers stated that Dr. Stroupe was unavailable to return to the room is never present during knee arthroscopies.

111.     Similarly, in Winter, 2011, Dr. Stroupe billed for but failed to provide postoperative care and was absent from the operating room during a gynecological procedure with surgeon Dr. Veronica Carver.  After the patient experienced distress during emergence from anesthesia, Dr.

24

Stroupe was called, but did not come for more than a half hour. When he arrived, he was in street clothes and he promptly left again, failing to examine the patient, order any studies, or prescribe any treatments. As the patient required further care, Dr. Carver and others paged Relator for assistance. Properly concerned that the patient was experiencing a stroke, Relator ordered emergency diagnostics and diagnosed a possible bad reaction from a medication. Relator later spoke with CRNA Fitzpatrick, who stated that Dr. Stroupe billed for medical direction for this Medicare patient, despite never being present in the operating room, never prescribing an anesthetic plan, and never providing care for the patient after the procedure.

112. In Fall, 2010, Dr. Dean was supposed to handle a cataract extraction with intraocular lens implant for an elderly man with Dr. Platt as the surgeon. According to CRNA Echo Fisher, Dr. Dean never entered the operating room, even after complications occurred, and never created an anesthetic plan. Dr. Dean also failed to perform a preanesthetic examination and evaluation. Dr. Dean billed for medically directing this Medicare case procedure.

113. These incidents represent but a small, representative sample of the fraudulent scheme to maximize revenue by fraudulent billing which TeamHealth both implemented and encouraged.

**E.    The Fraud is Being Committed at other TeamHealth Centers**

114. TeamHealth is a profit-driven healthcare provider that shapes its policies and strategies as any business does – on revenue growth and profits.

115. Relator is informed and believes that TeamHealth engages in fraudulent billing at its other facilities across the country to fulfill this goal.

116. As discussed above, in furtherance of TeamHealth's profit-driven objective and as it has at other centers, clinics, and hospitals across the country, TeamHealth immediately, upon

25

acquisition of Anesthetix, converted All Saints to a 100% medical direction, CRNA driven anesthesia practice which allowed it to pay less for doctors, but earn more from Medicare and Medicaid. Similar take overs and conversions were implemented at clinics and hospitals owned and managed by TeamHealth across the country.

117. Throughout his time at All Saints, Relator, as well as some CRNAs, regularly reported to TeamHealth Chief Medical officer Dr. Sonya Pease that widespread fraud was being committed at All Saints. Dr. Pease, however, instructed them on numerous occasions not to report the fraud to the hospital because it could jeopardize TeamHealth's contract. Knowledge of the fraud, thus, permeated the highest levels of TeamHealth. Indeed, on more than one occasion, Relator spoke directly with TeamHealth CEO Dr. Steve Gottlieb and informed him of the fraud being committed at All Saints.

118. Furthermore, Relator is informed and believes that similar frauds were being perpetrated at other TeamHealth facilities. For example, in Saginaw, Michigan, TeamHealth Anesthesia, Relator has knowledge that rampant billing fraud of similar nature has taken place for several years. At this facility, physicians and CRNAs, like at All Saints, routinely bill for medical direction when procedures would only be eligible for medical supervision. In fact, Relator is informed and believes that in at least 25 percent of cases, anesthesiologists at the Saginaw facility are not present for induction, and they do not check in during a procedure as a matter of practice.

119. In another example, Dr. Sonya Pease stated on numerous occasions that the Portland, Oregon practice, Portland Anesthesia Specialists, LLC, specifically, but all practices generally, was run in the same fraudulent manner as All Saints – that is, by billing on medical direction for all procedures, no matter how unlikely or impossible it was under the circumstances for the procedure to qualify for the higher rate. Doctors at the Oregon facility as well have shared

26

with Relator that extensive fraudulent billing practices are being committed at that facility by the anesthesia group under the direction of TeamHealth.

120.     Finally, at the Wolverine Anesthesia Consultants facility in Orlando, Florida, TeamHealth is committing similar Medicare and FCA violations, including billing for medical direction when procedures are ineligible for reimbursement.  For example, Relator learned that student nurse anesthesiologists are performing craniotomy (brain surgery) cases with no CRNA with them after only three months of clinical training and minimal anesthesia supervision from the physicians.  The center regularly bills under medical direction for these services despite the dearth of involvement from physicians.

121.     TeamHealth is a business designed to make money, in part, by taking advantage of the Medicare and Medicaid system.  Accordingly, when Relator reported the violations and the fraud described above repeatedly to Dr. Pease and Dr. Gottlieb, they failed to act.  Dr. Pease, along with the rest of the TeamHealth management needed to protect the company and its profits. TeamHealth officers knew that if they allowed Relator to expose the daily Medicare fraud being committed by TeamHealth, that it would affect their bottom-line, and it would lose the contract to provide the services to All Saints and the other TeamHealth facilities.  So, they covered it up, and fired Relator.

122.     TeamHealth had knowledge of the rampant fraud being perpetrated at the All Saints facility and at other facilities across the country.

   **E.     TeamHealth Retaliated Against Relator and Other Employees who Questioned TeamHealth's Practices**

123.     When physicians raised questions about TeamHealth's billing practices with TeamHealth management or raised patient care issues relating to TeamHealth's understaffing, those

physicians were retaliated against and/or dismissed or their contracts were not renewed.

124.     Soon after TeamHealth took over the anesthesia group at All Saints in 2011, Relator continued reporting the Medicare violations to senior officials at TeamHealth.

125.     Dr. Pease, the TeamHealth Medical Director, visited the hospital on several occasions throughout the year following the transition to TeamHealth, and each time she visited, Relator reported his concerns that the custom and practice followed by TeamHealth physicians could be considered fraud.  In particular, Relator told Dr. Pease that only a few doctors including Relator and Dr. Lane were following required procedures for Medical Direction and that all of the other physicians were barely in the operating room at all.  Dr. Pease ignored these complaints and took no action to stop them.

126.     Consistent with its pattern of retaliating against those who challenged its practices, in April 2011, after Dr. David Lane refused to make a staffing change which would have enabled additional fraudulent billing, Dr. Lane was given notice of his termination without cause.  At that time, Dr. Lane alerted Dr. Mamalakis that Mamalakis would also be fired because of his complaints about the fraud being perpetrated by TeamHealth.  Lane was replaced by Dr. Ippolito as Medical Director of the entire program, while Dr. Stroupe was made Chief of Cardiac Anesthesia.

127.     Relator continued to report to Dr. Pease that the group was committing fraud throughout 2011.

128.     On or about May, 2011, TeamHealth CEO Dr. Steve Gottlieb visited the hospital to meet with various administrators and doctors. While meeting with Dr. Gottlieb, Relator began explaining to Dr. Gottlieb the details of how TeamHealth was committing Medicare fraud, and how they needed to take immediate action to rectify the situation.

129.     As Relator was in mid-sentence explaining the severity of the situation, Dr. Gottlieb

abruptly stood up and ran out of the room in an attempt to avoid hearing any more of what Relator was describing.

130.    Shortly thereafter, Relator was informed by several CRNAs that Dr. Pease had specifically requested that they gather information of any and all possible infractions that Relator (and only Relator) may have committed because they wanted to fire him.

131.    Relator confronted Dr. Pease about this information, but Dr. Pease denied having done so, claiming that she was just looking for general information about the doctors and how the hospital was running.

132.    From May to July, 2011, Relator was kept under strict scrutiny as Dr. Pease looked for any excuse to terminate his employment. Despite this hostile environment, Relator performed his duties appropriately, and there were no concerns or complaints about his excellent performance.

133.    In June 2011, Dr. Ippolito vaguely informed Relator that what TeamHealth is going to do to him was wrong, but he was powerless to stop it and needed to keep his own job.

134.    In July 2011, Dr. Stroupe warned Relator that he would be fired.  Immediately, Relator called Dr. Pease who later informed him that Dr. Stroupe would apologize, and asked if Relator would forget the incident if he did.  Relator agreed.

135.    On July 12, 2011, Relator received an email from Dr. Pease which was also sent to Kimberly Oster and Marie Riley in the TeamHealth human resources department.  The title of the email was, "CONFIDENTIAL – Final Written Warning" and contained false allegations that Relator had acted inappropriately, such as engaging in "[g]ossiping and insubordinate behaviors" and "passive-aggressive professional interactions leading to group discord."  Relator was stunned by this email as no previous oral or initial written warnings had ever been given to Relator.

136.    The allegations in the July 12 email were false, as Relator had always acted with the

29

utmost professionalism.

137.    TeamHealth's protocol called for two warnings: a verbal warning followed by an initial written warning. Yet, TeamHealth violated their own protocol by providing Relator with a single, final written warning.  TeamHealth's protocol called for two warnings before a third, final warning.

138.    Dr. Pease demanded over the phone that Relator sign documents admitting to the false allegations in the July 12 email. She further threatened Relator that he "would never work as an anesthesiologist anywhere again" if he did not sign.  Relator did not sign.

139.    Despite the fact that Relator disputed the false allegations and refused to sign the July 12 email, Relator complied with the proposed "remedies" out of fear of losing his employment. Relator completed the Management Workplace Harassment training, read the Employment Handbook Harassment policy, and completed the certification form by July 17, 2011. Additionally, Relator was referred to the EAP program and contacted Darrell Kerr to set a date for future counseling. Furthermore, relator informed Mr. Kerr that he was being retaliated against because of his opposition to TeamHealth's fraudulent scheme.

140.    Later in July, 2011, Relator took a vacation. On July 22, 2011, while still on vacation, Relator received a letter from Dr. Pease via certified mail. The July 22 letter informed Relator that he was suspended.  That letter further instructed Relator to treat issues related to his employment as a confidential TeamHealth matter, not to be discussed with hospital personnel.  Shortly thereafter, however, Dr. Pease personally discussed the matter with hospital personnel and informed them that Relator was going to be fired by TeamHealth.  In doing so, Dr. Pease made false and disparaging statements about Relator's competence.  Shortly after this meeting, representatives of the hospital called Relator and alerted him that he was about to be fired.

30

Those representatives told Relator that they did not believe there was cause to fire him and they all offered their support to Relator.

141.    Shortly thereafter, while Relator was still on vacation, Dr. Pease called him and told him he was being terminated for cause. Dr. Pease refused to state the cause for termination. TeamHealth anesthesiologists then organized a party at a location called "Envy" to celebrate Relator's firing, inviting surgeons, CRNAs, hospital administration, and OR staff. Relator is informed that no CNRAs, surgeons, hospital administration, or OR staff attended the party because they felt Relator had been badly treated and did not deserve to be terminated.

142.    In contrast, to its private disparaging statements about the Relator and the quality of his care, TeamHealth continued to publicly praise Relator. On or about August 2, 2011, TeamHealth sent out a memo to the entire anesthesia practice stating that Relators "clinical expertise, professional dedication to his patients, and work ethic will be greatly missed."

143.    Since Relator was considered one of the best and hardest working anesthesiologists at the hospital, his termination was not received well. Multiple surgeons inquired as to the basis for Relator's termination, given the quality of his care. In response, TeamHealth provided the surgeons with false and contradictory reasons why relator had been terminated. In the beginning these reasons related to the quality of Relator's care and treatment of patients and staff, but when surgeons rejected them as unfounded, TeamHealth posited different and increasingly bizarre and disparaging explanations for terminating Relator. All of the foregoing makes it clear that TeamHealth's real purpose in terminating Relator was to rid themselves of his consistent voicing of concerns regarding TeamHealth's medical direction policies and billing practices, his refusal to abide by those practices, and ultimately his reporting concerning those practices to the TeamHealth senior management only a few months before his termination.

31

144.     Following his termination, Relator called representatives of the hospital to enlist their aid in getting his job back, and he was informed that while they sympathized, they had been told by TeamHealth internal management that his termination was an internal matter and that TeamHealth was unwilling to reverse its decision.

145.     As a result of being terminated wrongfully by TeamHealth, Relator suffered substantial damages.  Relator was blackballed in the community and was unable to obtain work nearby.  Instead, he was required to seek a job at a hospital 104 miles away—a commute of two hours in each direction.  Relator's compensation following his termination was substantially lower than the compensation from TeamHealth. Relator suffered serious reputational harm and emotional harm as a result of his termination.

146.     Relator was wrongfully retaliated against and terminated in violation of 31 USC § 3730 (h).


## COUNT I
## SCHEME TO SUBMIT FRAUDULENT CLAIMS (31 U.S.C. § 3729(a)(1)(A))

147.     All of the preceding allegations are incorporated herein.

148.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly presented or caused to be presented false or fraudulent claims for payment or approval in violation of 31 U.S.C. § 3729(a)(1)(A).

149.     As a result of Defendants' acts, the United States has been damaged, and continues to be damages, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

32

## COUNT II
## SUBMISSION OF CLAIMS CONTAINING FALSE EXPRESS OR IMPLIED CERTIFICATIONS (31 U.S.C. § 3729(a)(1)(A))

150.     All of the preceding allegations are incorporated herein.

151.     As more particularly set forth in the foregoing paragraphs, by virtue of the acts alleged herein, the Defendants have knowingly made, used, or caused to be made or used, false records or statements – i.e., the false certifications and representations made or caused to be made by defendant – material to false or fraudulent claims in violation of 31 U.S.C. § 3729(a)(1)(B).

152.     As a result of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial, and the United States is entitled to at least $5,000 and up to $11,000 for each and every violation of 31 U.S.C. § 3729 arising from Defendants' unlawful conduct as described herein.

## COUNT III
## FALSE RECORDS FOR PAYMENT (31 U.S.C. § 3729(a)(1)(B))

153.     All of the preceding allegations are incorporated herein..

154.     Defendants submitted false records or statements to the Government representing that Defendants were entitled to payment and approval for health care services provided to beneficiaries of federal health insurance programs, including, among other things: Medically directed anesthesia services performed in operating rooms and other medical facilities when in fact such services did not meet the criteria for medical direction.

155.     All such false records or statements were knowingly made to the Government to get false or fraudulent claims paid or approved by the Government.

156.     Defendant thus knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the Government.

33

## COUNT IV
## FALSE CLAIMS CONSPIRACY (31 U.S.C. § 3729(a)(1)(C))

157.     All of the preceding allegations are incorporated herein.

158.     Defendants entered into a conspiracy or conspiracies through their member physicians, officers, and employees to defraud the United States by submitting and obtaining approval and payment for false and fraudulent claims for health care services provided to beneficiaries of federal health insurance programs, for among other things: Medically directed anesthesia services performed in operating rooms and other medical facilities when in fact such services did not meet the criteria for medical direction.

159.     Defendants also conspired through their member physicians, officers, and employees to omit disclosing or to actively conceal facts which, if known, would have reduced the federal government's obligations to pay them or would have required them to repay the federal government.

## COUNT V
## FALSE RECORDS TO AVOID REFUND (31 U.S.C. § 3729(a)(1)(G))

160.     All of the preceding allegations are incorporated herein.

161.     By virtue of the acts alleged herein the Defendants knowingly made, used or caused to be made or used false records or false statements that are material to an obligation to pay or transmit money to the Government.

## COUNT VI
## RETALIATION (31 U.S.C. § 3730(h))

162.     All of the preceding allegations are incorporated herein.

163.     By virtue of the acts alleged herein, Defendants threatened, harassed, and/or dismissed, and/or discriminated against, Relator in the terms and conditions of his employment after

34

lawfully reported what he believed to be fraudulent conduct or wrongdoing to his superiors in violation of 31 U.S.C. § 3730(h).

164.     Relator seeks compensatory damages and other appropriate statutory relief pursuant to this section.

## COUNT VII
### (California False Claims Act)
### (Cal. Govt. Code §§ 12651 et seq.)

165.     All of the preceding allegations are incorporated herein.

166.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

167.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

168.     The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

169.     By reason of the Defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

170.     Pursuant to Cal. Govt. Code § 12651(a), the State of California is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

35

## COUNT VIII
### (Colorado Medicaid False Claims Act)
### (C.R.S. § 25.5-4-303.5. et seq.)

171. All of the preceding allegations are incorporated herein.

172. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Colorado State Government for payment or approval.

173. By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Colorado State Government to approve and pay such false and fraudulent claims.

174. The Colorado State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

175. By reason of the Defendants' acts, the State of Colorado has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

176. Pursuant to C.R.S. § 25.5-4-305, the State of Colorado is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT X
### (Florida False Claims Act)
### (Fla. Stat. Ann. §§ 68.081 et seq.)

177. All of the preceding allegations are incorporated herein.

178. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

36

179.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

180.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

181.     By reason of the Defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

182.     Pursuant to Fla. Stat. Ann. § 68.082(2), the State of Florida is entitled to three times the amount of actual damages plus the maximum penalty of $11,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

### COUNT XV
### (Michigan Medicaid False Claims Act)
### (Mich. Comp. Laws §§ 400.601 et seq.)

183.     All of the preceding allegations are incorporated herein.

184.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the State of Michigan for payment or approval.

185.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

186.     The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and

37

continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

187.     By reason of the Defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

188.     Pursuant to Mich. Stat. § 400.612, the State of Michigan is entitled to a civil penalty equal to the full amount received by the person benefiting from the fraud, three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XVII
### (New Jersey False Claims Act)
### (N.J. Stat. Ann. §§ 2A:32C-1 et seq.)

189.     All of the preceding allegations are incorporated herein.

190.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Jersey State Government for payment or approval.

191.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Jersey State Government to approve and pay such false and fraudulent claims.

192.     The New Jersey State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

193.     By reason of the Defendants' acts, the State of New Jersey has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

38

194.     Pursuant to N.J. Stat. Ann. § 2A:32C-3, the State of New Jersey is entitled to three times the amount of actual damages plus the maximum penalty allowed under the federal False Claims Act, 31 U.S.C. § 3729, for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## COUNT XXII
### (Wisconsin False Claims for Medical Assistance Law)
### (Wisc. Stat. § 20.931)

195.     All of the preceding allegations are incorporated herein.

196.     By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the Wisconsin State Government for payment or approval.

197.     By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Wisconsin State Government to approve and pay such false and fraudulent claims.

198.     The Wisconsin State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

199.     By reason of the Defendants' acts, the State of Wisconsin has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

200.     Pursuant to Wisc. Stat. § 20.931(2), the State of Wisconsin is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

39

## COUNT XXIII
## (District of Columbia False Claims Act)
## (D.C. Code Ann. §§ 2-308.03 et seq.)

201.    All of the preceding allegations are incorporated herein.

202.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

203.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

204.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by Defendants, paid and continues to pay the claims that would not be paid but for the acts and/or conduct of Defendants as alleged herein.

205.    By reason of the Defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

206.    Pursuant to D.C. Code Ann. § 2-308.14, the District of Columbia is entitled to three times the amount of actual damages plus the maximum penalty of $10,000 for each and every false or fraudulent claim, record or statement made, used, presented or caused to be made, used or presented by Defendants.

## PRAYER FOR RELIEF

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally, as to the federal claims:

A.    Three times the amount of damages that the Government sustains because of the acts of Defendants;

B.    A civil penalty of $11,000 for each violation;

C.    An award to the Qui Tam Plaintiff for collecting the civil penalties and damages;

D.    Award of an amount for reasonable expenses necessarily incurred;

E.    Award of the Qui Tam Plaintiff's reasonable attorneys' fees and costs;

F.    Interest;

G.    Such relief as is appropriate under the provisions of 31 U.S.C. § 3730(h) of the False Claims Act for retaliatory discharge, including: (1) two times the amount of back pay with appropriate interest; (2) compensation for special damages sustained by Relator in an amount to be determined at trial; (3) litigation costs and reasonable attorneys' fees; (4) such punitive damages as may be awarded under applicable law; and (5) reasonable attorneys' fees and litigation costs in connection with Relator's Section H claim;

H.    Such further relief as the Court deems just.

WHEREFORE, for each of these claims, the Qui Tam Plaintiff requests the following relief from each of the Defendants, jointly and severally, as to the State claims:

A.    Relator and each named State Plaintiff be awarded statutory damages in an amount equal to three times the amount of actual damages sustained by each State as a result of Defendants' actions, as well as the maximum statutory civil penalty for each violation by Defendants within each State, all as provided by:

Cal. Govt. Code § 12651;
C.R.S. § 25.5-4-305;
Fla. Stat. Ann. § 68.082;

41

Mich. Comp. Laws § 400.612;
N.J. Stat. Ann. § 2A:32C-3;
Wisc. Stat. § 20.931(2); and
D.C. Code Ann. § 2-308.14;

B.     Relator and Plaintiff State of Texas be awarded statutory damages in an amount equal to two times the amount of actual damages that Texas has sustained as a result of the Defendants' actions within Texas, as well as the maximum statutory civil penalty for each violation of Tex. Hum. Res. Code Ann. § 36.052;

C.     Relator be awarded his relator's share of any judgment to the maximum amount provided pursuant to:

Cal. Govt. Code § 12652(g)(2);
C.R.S. § 25.5-4-305;
Fla. Stat. Ann. § 68.085;
Mich. Comp. Laws § 400.610a;
N.J. Stat. Ann. § 2A:32C-7;
Wisc. Stat. § 20.931(11); and
D.C. Code Ann. § 2-308.15;

D.     Relator be awarded all costs and expenses associated with each of the pendent State claims, plus attorney's fees as provided pursuant to:

Cal. Govt. Code § 12652(g)(8);
C.R.S. § 25.5-4-305;
Fla. Stat. Ann. § 68.086;
Mich. Comp. Laws § 400.610a;
N.J. Stat. Ann. § 2A:32C-8;
Wisc. Stat. § 20.931(11); and
D.C. Code Ann. § 2-308.15;

E.     Relator and the State Plaintiffs be awarded such other and further relief as the Court may deem to be just and proper.

## JURY DEMAND

Relator hereby demands trial by jury.

Dated: March 19, 2018

By: */s/ Daniel N. Rosen*
**DANIEL N. ROSEN**
**KLUGER, KAPLAN, SILVERMAN, KATZEN &**
**LEVINE, P.L.**
Wis. Bar No.: 1094765
60 South 6th Street, #3615
Minneapolis, MN 55402
612-767-3000
*drosen@klugerkaplan.com*

and

**DAVID S. STONE**
**STONE & MAGNANINI, LLP**
100 Connell Drive
Suite 2200
Berkeley Heights, NJ 07922
(973) 218-1111
*dstone@stonemagnalaw.com*

COUNSEL FOR PLAINTIFF-RELATOR

43